Robert M. DiSTASIO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 575–88T.

United States Claims Court.

Nov. 16, 1990.

Steven P. Schneider, with whom were Robert E. Dallman and Timothy A. Nettesheim, Milwaukee, Wis., for plaintiff.

Jennifer Dover Spriggs, with whom was Asst. Atty. Gen. Shirley D. Peterson, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

This case is before the court after trial in Milwaukee, Wisconsin, May 21–24, 1990. Robert M. DiStasio (plaintiff) has sued for a refund of federal tax penalties assessed and collected under Internal Revenue Code (I.R.C.) § 6672 (1978), (26 U.S.C.), for unpaid employment taxes of A & S Mechanical Contractors, Inc. (A & S); A & S Electrical Contractors, Inc. (A & S Electrical); A–Emergency Sewer Cleaners, Inc. (A–Emergency); and Meccon Enterprises (Meccon) for the six consecutive tax quarters ending June 30, 1984. Defendant claims that plaintiff was a "responsible person" under I.R.C. § 6672 (1978), who willfully failed to pay employee withholding taxes to the Government, and therefore is not entitled to a refund of the $11,367.16 which plaintiff paid to the Government. Further, defendant counterclaimed for the remainder of the $99,888 which it assessed plaintiff for the six tax quarters at issue. Defendant also claims that this court is without jurisdiction as to plaintiff's additional claim for a refund of $5,544.19 paid by plaintiff's bankruptcy trustee, since this refund claim was allegedly not filed within the period allowed by the applicable statute of limitations.

For the following reasons, the court finds that under the particular facts presented in this case, plaintiff was not a "responsible person." In any event plaintiff did not willfully fail to pay employee withholding taxes to the Government under the standards of I.R.C. § 6672 (1978), and the applicable case law. Thus, plaintiff is entitled to a refund of $11,367.16 and defendant's counterclaim will be denied. Fur-

ther proceedings will be ordered respecting plaintiff's claim for the refund of $5,544.19.

### Factual Background [1]

Prior to January 1983, plaintiff, a licensed master plumber, owned and operated Bob's Plumbing, Inc. (Bob's Plumbing), which was headquartered in his home in New Berlin, Wisconsin. Plaintiff estimated plumbing jobs, performed plumbing work and supervised his employees. Plaintiff's wife and an outside accountant handled the bookwork.

In 1982, Allan Hudlett, President and controlling shareholder of A & S, asked plaintiff to merge Bob's Plumbing with A & S. Hudlett sought to expand A & S into a full line mechanical contracting business.[2] At the time he contacted plaintiff, Hudlett was teamed with Jeffrey Schlender, a sheetmetal worker. Schlender apparently owned stock in A & S, but the record is unclear as to the number of shares he owned before the merger with plaintiff.

In January 1983, based upon Hudlett's assurances concerning the financial viability of the proposed merger, plaintiff orally agreed to merge his business with A & S.[3] Merged operations commenced on a handshake basis in January 1983.

In March 1983, the principals of A & S—Hudlett, Schlender, and plaintiff—formalized the "merger" by executing shareholder and voting agreements in which plaintiff transferred all of his stock in Bob's Plumbing to A & S. Hudlett's attorney, Gregory Hays, prepared the merger instruments based upon Hudlett's directions respecting the numbers of shares to be issued to each owner and matters relating to control of the company. Each of the parties became an officer in the corporation. Plaintiff and Schlender each received 24.5 percent and Hudlett retained 51 percent of A & S voting common stock, the only A & S stock that was issued and outstanding during the period involved. Hudlett's purpose in retaining 51 percent of the stock was to maintain complete control of A & S.

After the merger, A & S was run exactly as it had been prior to the merger—Hudlett managed A & S's overall operations and Hudlett and Nina Rendazzo handled its financial affairs.[4] Specifically, Hudlett and Rendazzo handled employee payroll, the payment of creditors' bills, the payment of federal and state taxes, and virtually every other financial matter. Hudlett also coordinated the management of A & S's offices. Plaintiff had no input into the financial affairs of the corporation. Hudlett admitted that plaintiff did not want any part of nor did he control any of the company's financial affairs.

Generally, the books and records relating to the financial affairs of A & S were kept under lock and key in Rendazzo's office. Hudlett and Rendazzo were the only ones with access to these records. If Rendazzo was not in her office, even the receptionist, Barbara Jastrow, could not gain access to the records.[5] Although plaintiff probably could have demanded and obtained access to these corporate records it is doubtful that he would have understood them since his formal education stopped with the

---

1. The facts contained in this factual background are the facts this court has found after trial although many of these facts were the subject of conflicting testimony. The court wishes to stress that its ruling is strictly limited to the particular facts of this case.

2. That type of business generally includes plumbing, heating, ventilation, air conditioning, pipe and sheetmetal work.

3. In fact, Hudlett represented to plaintiff that A & S had approximately $90,000 in the bank with no outstanding debts. Plaintiff believed Hudlett's financial representations, and therefore did not investigate in any fashion the accuracy of Hudlett's statements.

4. Mrs. DiStasio did not perform bookkeeping services for A & S because Hudlett prohibited wives from participating in the business and because Nina Rendazzo was already employed as A & S's bookkeeper and his confidant.

5. A & S hired Jastrow as a receptionist in September 1983, and she stayed with the company until March 1984. Apparently, plaintiff had nothing to do with her employment. Jastrow's duties were assigned to her by Hudlett and Rendazzo. Her testimony was that she typed checks, routed mail to the principals in the company, answered phones, dispatched workers, and performed general office work.

eighth grade and he had had almost no experience in financial matters. Moreover, as Dean Bartlett, A & S's Certified Public Accountant (CPA) testified, A & S's books were in such disarray that even he, Bartlett, had difficulty understanding them.[6]

When creditors would call, they were referred to Hudlett or Rendazzo, not to plaintiff.[7] According to Jastrow, when A & S paid its creditors' bills, Hudlett or Rendazzo would give her a handwritten list of approved creditor payments along with a number of blank checks. The list was always in Hudlett's handwriting. Jastrow testified that plaintiff never authored or presented her with such a list. However, because the signatures of two corporate officers were required on virtually all corporate checks, plaintiff (and Schlender) did sign a number of the checks authorized by Hudlett.[8] Frequently, plaintiff would sign a large number of blank checks, given to him by Rendazzo or Jastrow which would then be filled in according to Hudlett's directions.[9] Many times plaintiff's signature was requested as he was running out

the door to a job site.[10] Plaintiff often would not know the payees of those checks. Plaintiff testified that he assumed all creditors were being paid by Hudlett. Further, he did not recall ever having signed a check or paid a bill without Hudlett's approval.

Bartlett, the company's CPA, always dealt with Hudlett and Rendazzo, not plaintiff, when he needed information to perform audits and prepare financial statements. Bartlett always discussed payroll and income taxes with Hudlett, and believed that Hudlett, not plaintiff, had overall financial responsibility at A & S.[11] Plaintiff did not usually meet with either Bartlett or Rendazzo.[12]

The only contact plaintiff had with the financial affairs of the corporation was when Hudlett would call unscheduled meetings, approximately monthly, of the officers of A & S. When finances were discussed during these meetings they were discussed in a very informal and haphazard manner. Plaintiff was never called upon to offer or offered any financial information at these meetings. Typically, Hudlett

---

6. Without a doubt, Rendazzo failed to adequately maintain A & S's financial records. In fact, at one point she was six months behind in her bookkeeping duties. Jastrow testified that the books were frequently not ready for periodic review by Bartlett.

7. Plaintiff's sole involvement with A & S's creditors was to begin taking their calls, sometime in 1984, after Rendazzo and Hudlett quit accepting or returning their calls.

8. During part of 1983 certain accounts required only one signature for checks under $2,000.

9. However, it was not the office practice for one or the other principal to sign checks in blank and the other to direct where they were going. Hudlett never signed checks in blank (except perhaps when he took a vacation). On the other hand, plaintiff would sign checks in blank when he was present in the offices.

 Schlender's testimony completely corroborated plaintiff's testimony regarding the issuance of A & S checks. On redirect examination he described a typical check signing session: "Al [Hudlett] would have a bundle of checks ready to sign, and since it took two peoples' names on a check to get it out the door, we'd all sit at a table; Bob [plaintiff], Alan [Hudlett] and myself, at a desk and signing checks. You'd see one with one empty spot, you'd sign it and put it in the finished pile. And, it would happen very rapidly, very quickly.

And, I believe, at times there must have been some blank checks there that we'd need to get some more checks out, I haven't had time to fill them out, we're gonna need a half a dozen more. So, we'd sign a bunch more. But, it was never as it seems to be: that we looked it over and said, "Oh, no, don't do this; don't do that." It was quick, quick, fast, and we had to get on our jobs."

10. For example, Jastrow testified that "frequently, as he [plaintiff] was trying to get out the door to go for an appointment, they [Hudlett and Rendazzo] would stop him and say, could you sign these [checks] and hand him a stack. And, he'd quickly write his name and leave for his meeting." Frequently, plaintiff would then say "what am I signing them for? And they [Hudlett and Rendazzo] would just say, well, we've got a list. We're paying the bills."

11. When Bartlett would come to A & S's offices, he would usually meet with Hudlett. Also, Hudlett was the principal who asked Bartlett to prepare the financial statement needed for a Small Business Administration loan discussed later in this Opinion.

12. Although Rendazzo testified that she kept plaintiff informed of the financial affairs of the corporation, the court finds this testimony totally lacking in credibility.

would dominate these meetings. He would show Schlender and plaintiff a sheet from a legal pad containing financial data and represent that the financial condition of A & S was excellent, that cash shortage problems were only temporary, and that these problems would be overcome by expected revenues. Apparently, Schlender and plaintiff never seriously questioned the accuracy of Hudlett's representations. However, neither were financially sophisticated. Certainly plaintiff was not capable of seriously challenging Hudlett's representations. Rendazzo's testimony generally confirmed the fact that plaintiff lacked any significant degree of financial knowledge.

While Hudlett and Rendazzo were controlling the financial affairs of A & S, plaintiff primarily ran the plumbing operations.[13] Plaintiff was responsible for bidding plumbing jobs and hiring and firing workmen for his operations whom he employed from the local union hall. Plaintiff always based his plumbing bids for A & S on the prevailing union wage scale as he had previously done for Bob's Plumbing. While plaintiff received mail which was addressed to him individually he did not receive corporate mail addressed to A & S. That mail always went directly to Hudlett. Customer checks and all IRS correspondence always went directly to Hudlett.

In general, plaintiff did not respond to suppliers' questions concerning their bills. Moreover, plaintiff was rarely in the company's offices and was usually in the field bidding jobs and performing plumbing work. When plaintiff's plumbing employees needed materials and supplies for a job, they individually ordered them from supply houses and had them sent directly to the job sites. The suppliers then billed the purchases to A & S. All of these bills were routed directly to Hudlett, who decided which creditors would be paid immediately and which would not. Plaintiff went along with all of Hudlett's financial decisions since Hudlett was in charge of this area of operations.

At the time A & S merged with Bob's Plumbing, A & S already owned one subsidiary, Meccon.[14] A & S later formed two additional subsidiaries. The first, A–Emergency, was created when Hudlett approved a request, initially presented by plaintiff, from Jim Mahan, plaintiff's plumbing subcontractor, to join A & S. Essentially, Mahan's A–Emergency operation unstopped sewers and drain pipes. At Hudlett's direction, Gregory Hays drafted articles of incorporation for A–Emergency. Hudlett negotiated Mahan's salary. The second subsidiary, A & S Electrical was formed when Jack Dahlke brought his electrical business to A & S. Again, Hudlett, not plaintiff, had Hays incorporate this company. At that point, Dahlke, Schlender, and DiStasio each operated their respective business units under the parent corporation, A & S, and under the personal supervision and control of Hudlett, although corporate formalities were not expressly followed.[15] Plaintiff usually had no involvement with A & S's subsidiaries other than to sign payroll checks when these were placed in front of him.

After these subsidiaries were acquired, Hudlett remained as President of A & S, plaintiff was made Vice–President and Treasurer, and Schlender became Secretary of A & S. These titles were mere formalities and did not coincide with their actual

---

**13.** Plaintiff told Hudlett at the outset of this venture that "all I do is plumbing and that's it." Hudlett responded by stating that "I'll run the business, you just do your plumbing work."

**14.** Meccon had no apparent business purpose during the tax periods in question.

**15.** Contrary to the Government's contention that plaintiff set up these subsidiaries, the evidence shows that Hudlett was responsible for establishing these companies. Although plaintiff signed the Articles of Incorporation of A–Emergency, he did so only after Hudlett told him to, and after Hudlett said "just sign it ... it doesn't mean anything." In fact, plaintiff testified he could not recall ever signing any legal documents when it was not pursuant to the directions of Hudlett. It was Hudlett's idea that A & S Electrical be formed. Hudlett approached plaintiff about the idea, and Hudlett was the one who negotiated the deal—including Dahlke's salary and responsibilities—with Dahlke.

duties.[16]

As early as February 1983, A & S and its subsidiaries experienced financial difficulties. However, the evidence shows that only Hudlett and possibly Rendazzo were fully aware of the extent of these problems. As a result of such difficulties, Hudlett frequently asked plaintiff to take out small personal or individual short term loans to pay debts and to finance future A & S projects. Plaintiff agreed to undertake these loans because he understood that all construction companies at one time or another have short term cash flow problems. All of plaintiff's loans were evidenced by simple, short term, fixed-rate notes, with terms set by the bank.[17] Thomas Laabs, a banker, testified that these loans to plaintiff were "take it or leave it from the banker's perspective." Plaintiff's small loans were usually made by First Wisconsin Bank in Brookfield, Wisconsin, a bank with which plaintiff had frequently dealt in the past.

In late spring of 1983, Hudlett convinced plaintiff and Schlender to help him secure a $300,000 loan guaranteed by the Small Business Administration (SBA) from the Mitchell Street State Bank where A & S did most of its banking. Hudlett told plaintiff that $200,000 of the loan proceeds would be used to bid on large projects while $100,000 would be put in a certificate of deposit which would carry a higher interest rate than that payable in connection with a SBA guaranteed loan. Hudlett told plaintiff he planned to use the interest from the certificate of deposit to make interest payments on the SBA guaranteed loan.[18] Plaintiff's only involvement with this loan was to attend the closing and sign loan documents which, at the time, he essentially did not understand. For example, plaintiff did not know when he signed the loan documents that his signature personally obligated him for repayment of the loan in case of default.[19] In effect, Hudlett was the principal party who put the loan package together and dealt with Gregory Jolliff, A & S's loan officer and other bank officials regarding the loan. The first time Jolliff met with plaintiff at any significant length was at the closing.

Hudlett always provided any A & S financial information required to secure corporate loans. This was especially true regarding the SBA loan. Jolliff testified that although he had substantial contact with Rendazzo, A & S's financial statements were directed to him by Hudlett. The only significant information plaintiff ever supplied to A & S's various bankers was operational status reports on the plumbing jobs that were in process. Thus, plaintiff supplied no significant financial information on A & S's operations to the bank.

In August 1983, Schlender left A & S.[20] Thereafter, plaintiff owned 49 percent of

---

**16.** For example, plaintiff was Treasurer of A & S, but never was involved in the corporation's finances and never had possession of or access to the corporate books and records. In fact, plaintiff did not wish to be Secretary because he thought of his wife as a "secretary" and because his spelling was poor. Also, plaintiff testified that he could not perform simple math without the use of a calculator, yet he was named Treasurer. Plaintiff simply told Hudlett to "put anything down, but not Secretary" when Hudlett asked what corporate title he wanted. Hudlett agreed that corporate titles were meaningless. The only title which actually corresponded with an officer's actual duties at A & S was Hudlett's title of President.

**17.** For example, plaintiff took out a $4,000 loan on February 15, 1983 which had a maturity date of February 28, 1983. This was a typical loan for plaintiff. On September 29, 1983, plaintiff took out a loan for $5,300 which had a maturity date of November 28, 1983.

**18.** Due to A & S's financial problems, Hudlett failed to purchase the $100,000 certificate of deposit. The record does not reflect what Hudlett actually did with the $100,000. In any event, plaintiff did not learn of Hudlett's failure until after the six tax quarters here at issue.

**19.** In fact, Gregory Jolliff, A & S's loan officer was the first to tell plaintiff he would be personally liable on the loan if A & S defaulted. Plaintiff asked him why he did not mention this to him earlier, and Jolliff told him that he had not because he (DiStasio) was not the President.

**20.** Hudlett and Schlender, without plaintiff's concurrence, negotiated the deal wherein Schlender left A & S in exchange for approximately $6,000. In fact, plaintiff had virtually no involvement in this transaction.

the stock of A & S and also took over Schlender's title as Secretary. However, his acquisition of an additional corporate title in A & S did not affect his day to day duties or those of any other employees or result in his discovery of the corporation's serious financial problems. Plaintiff merely continued to operate the plumbing business. In fact, Hudlett, who still owned 51 percent of the stock, surrendered no authority to plaintiff in connection with naming plaintiff Secretary. Hudlett, with some assistance from plaintiff, personally took over the day to day sheetmetal operations which Schlender had abandoned.

Plaintiff first learned that A & S was not current in its payment of withholding taxes to the Internal Revenue Service (IRS) when IRS agent Joseph Hynes visited A & S on January 17, 1984 and met with Hudlett and plaintiff.[21] Immediately after the meeting, plaintiff expressed his shock and anger that Hudlett had not kept current with the company's tax obligations. Plaintiff emphatically implored Hudlett to pay the overdue taxes. Plaintiff also told Hudlett to pay the Government *before* paying the creditors; that it was better to pay the Government first and to fall behind on other creditors' accounts. Plaintiff testified that he believed Hudlett when he assured him that everything would be worked out and that he, Hudlett, would pay the taxes. Further, Hudlett told plaintiff that A & S had more money coming in which would be used to pay the taxes. However, in February 1984 plaintiff was forced to personally borrow $15,000 on behalf of A & S so that Hudlett could pay their creditors, including the IRS. In negotiating this loan plaintiff told Thomas Laabs, the banker involved, that the $15,000 was needed to help pay outstanding taxes. Plaintiff testified that he would not have taken out this loan had he believed that Hudlett would not use the proceeds to pay off the company's tax obli-

gations. During this period in early 1984, Hudlett and Rendazzo continued to handle all payments to creditors.

In early 1984 Hudlett assured plaintiff in various meetings that expected revenues would enable the company to pay all of its creditors. However, by late spring of that year plaintiff finally realized the poor financial condition of A & S, that his own plumbing operations were the sole source of operating funds for A & S, and that the prospects for payment to the IRS were dismal. Therefore, on May 30, 1984 he resigned.[22]

On June 29, 1984 a petition was filed with the bankruptcy court seeking A & S's dissolution under Chapter 7, 11 U.S.C. Thereafter, Hudlett and Rendazzo left the state. On August 10, 1984, after the Mitchell Street State Bank and the SBA foreclosed on plaintiff's personal guarantee of A & S's SBA loan, plaintiff filed for personal bankruptcy. Subsequently, plaintiff became an estimator and office manager for his son's plumbing company, J.R. Plumbing.

On December 29, 1986, the IRS assessed against plaintiff a 100 percent penalty pursuant to I.R.C. § 6672 (1978), in the amount of $77,746.17 for employment tax liabilities for Meccon for the quarter ending December 31, 1983, and A & S for the quarters ending September 30, 1983 through June 30, 1984. On January 5, 1987, the IRS assessed against plaintiff a 100 percent penalty pursuant to I.R.C. § 6672 (1978), in the amount of $22,142.19 for the employment tax liabilities of A & S Electrical for the quarters ending March 31, 1983 and December 31, 1983, and A–Emergency for the quarters ending March 31, 1983 through June 30, 1984.

On September 30, 1988, after the IRS denied plaintiff's refund claim, plaintiff

**21.** Joseph Hynes testified that he could not recall anything specifically which would indicate that plaintiff had any knowledge of tax liabilities before January 17, 1989.

**22.** The court rejects as not credible the testimony of Hudlett and Rendazzo that they shared financial information with plaintiff, that plaintiff was aware of tax delinquencies prior to

January 17, 1984, that plaintiff insisted on two signature checks, that plaintiff suggested forming A–Emergency and A & S Electrical, that plaintiff understood all aspects of the SBA loan, that plaintiff and Hudlett jointly decided which creditors to pay or that Bartlett told plaintiff about unpaid taxes in November 1983.

filed a complaint with this court seeking a refund of $11,367.16 paid by plaintiff for the I.R.C. § 6672 (1978), penalties assessed him. In addition, plaintiff seeks a refund of $5,544.19 sent by the bankruptcy court on behalf of the bankrupt's estate to the IRS. The Government opposes plaintiff's recovery of any refund, including the $5,544.19 sent by the bankruptcy court, and by its counterclaim seeks to recover the remaining amount of the alleged deficiency. After pretrial briefing and trial, the court held a brief status conference on June 15, 1990, and stated that it expected to issue a ruling in due course in favor of plaintiff's request for a refund of the $11,-367.16. This Opinion is in conformity with that preliminary ruling.

## DISCUSSION

### I.

*A. Responsible Person.*

I.R.C. § 6672(a) (1978) [23] provides, in pertinent part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or attempts in any manner to evade or defeat any such tax or payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

I.R.C. § 6671(b) (1976), defines the word "person" as used in I.R.C. § 6672(a) (1978) as follows:

[A]n officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

■ When an employer deducts employment taxes from its employees' paychecks, it holds those funds in trust for the benefit of the United States. Since employees are credited for the amounts of Federal Insur-

ance Contributions Act (FICA), and income taxes withheld from their wages regardless of whether the employer ultimately pays them over to the government, Congress has allowed the IRS more stringent protective devices such as I.R.C. § 6672 (1978), to insure collection of payroll taxes. *Bolding v. United States*, 215 Ct.Cl. 148, 157–58, 565 F.2d 663, 669 (1977). Therefore, I.R.C. § 6672 (1978), imposes a penalty on anyone responsible for breaching that trust.

Courts have consistently interpreted I.R.C. § 6672 (1978), as requiring proof of two elements: the person against whom the penalty is charged must have been under a duty to collect and pay over the taxes, and must have acted willfully in not fulfilling that duty. I.R.C. § 6672 (1978); *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984); *Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985) (burden of proof is on the taxpayer to show he is not a responsible person). Courts typically describe a person who is under a duty to collect and pay over the taxes as a "responsible person." *Slodov v. United States*, 436 U.S. 238, 246, 98 S.Ct. 1778, 1784, 56 L.Ed.2d 251 (1978).

■ The issue of whether a person is a "responsible person" under I.R.C. § 6672 (1978), is a question of fact which is based upon the particular facts of each case. *Godfrey v. United States*, 748 F.2d 1568, 1575 (Fed.Cir.1984). The Federal Circuit has stated that:

The overwhelming weight of case precedent requires the factfinder to look through the "mechanical functions of the various corporate officers" ... to determine the persons having "the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." ... The inquiry required by the statute is "a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be respon-

---

**23.** The purpose of the 100 percent penalty provision "is to permit the taxing authority to reach those responsible for the corporation's failure to

pay the taxes which are owing." *White v. United States*, 178 Ct.Cl. 765, 372 F.2d 513 (1967).

sible for the corporation's failure to pay over its taxes."

Under the Federal Circuit's analysis, there can be more than one "responsible person" in a corporation and liability is not necessarily imposed on the most responsible person. *Godfrey v. United States*, 748 F.2d 1568, 1575 (Fed.Cir.1984).

■ While each case is determined on its own particular facts, certain factors are important in determining whether a particular person is a "responsible person" under I.R.C. § 6672 (1978). These factors include the person's control of the voting stock, status in the corporation, check signing authority, duties, and control and authority over the day to day management of the corporation's affairs.[24] *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984) ("where a person has authority to sign checks of the corporation ... or to prevent their issuance by denying a necessary signature ... or where that person controls the disbursement of the payroll ... or controls the voting stock of the corporation ... he will generally be held 'responsible.' ") However, the mechanical duties of signing checks is not alone determinative of liability under I.R.C. § 6672 (1978). *Godfrey v. United States*, 748 F.2d 1568, 1575 (Fed.Cir.1984); *Barrett v. United States*, 217 Ct.Cl. 617, 580 F.2d 449 (1978); *Heimark v. United States*, 18 Cl.Ct. 15, 22 (1989).

■ Based upon a careful review of all the evidence presented by the parties, the court is convinced that plaintiff has met its burden of showing that he was not a "responsible person" under I.R.C. § 6672 (1978). First, plaintiff never owned a controlling interest in A & S. Plaintiff initially owned only 24.5 percent and ultimately 49 percent of the stock. There were initially three and later only two stockholders in the company during the tax quarters in issue, and Hudlett always owned more than 50 percent of the stock. Therefore, as a minority stockholder in A & S, plaintiff could

never, at any point in his tenure at A & S, have made a management decision without Hudlett's agreement. In fact, as majority stockholder, Hudlett had the power to remove plaintiff as a corporate officer, or even terminate his employment at any time. Clearly, plaintiff could not have forced Hudlett to do anything which Hudlett did not want to do. Hudlett had control of A & S and he exercised it. As indicative of this when plaintiff sought to retain Schlender as an outside consultant after Schlender left the corporation, Hudlett overruled plaintiff and forced Schlender's complete disassociation from A & S.

Second, plaintiff never managed A & S on a day to day basis nor played a role of any consequence in the financial affairs of A & S and its subsidiaries. Plaintiff reported for work at his office for only one or two hours a day, and that was for the limited purpose of reading mail addressed to him personally, signing checks, many of which he signed in blank, picking up his messages, and ordering last minute supplies for jobs.[25] Plaintiff has convincingly shown by his and his witnesses' testimony that it was Hudlett who controlled the day to day management of the corporation and its subsidiaries, determined the payment of taxes, supervised the payroll, handled relations with creditors and banks, controlled access (along with Rendazzo) to the corporate books and records, and made all major financial planning decisions of A & S. Plaintiff, on the other hand, had little knowledge of the company's financial affairs, had no ready access to the corporate books and records, and was without sufficient financial knowledge to have understood them had he gained access to them. Plaintiff could not have written a corporate check without first asking permission of Hudlett. Plaintiff did not file corporate tax forms, prepare corporate payrolls, meet with corporate accountants, such as Dean Bartlett, or deal with any corporate attor-

---

**24.** While most courts have considered these factors as relevant to such a determination, this list is certainly not exclusive.

**25.** Even when plaintiff ordered supplies from various supply houses, he did so only by charging his purchases to A & S's account. All bills for these purchases went to Hudlett and Rendazzo for approval and payment.

neys relating to the legal affairs of the company. Hudlett did all of these things as President of the company.[26]

Defendant contends that since plaintiff had check signing authority he was a responsible person. It is true that two signatures were required on all A & S checks over $2,000, and on some other checks under $2,000. It is also true that for the first two tax quarters at issue, Schlender, Hudlett, and plaintiff were the only people authorized to sign checks, and for the last four quarters at issue, Hudlett and plaintiff were the only people authorized to sign checks. However, plaintiff frequently signed large stacks of checks in blank, and these checks were then sent to a list of creditors compiled solely by Hudlett and Rendazzo. Plaintiff never had the authority nor the knowledge to direct payment of these checks to anyone. If plaintiff had such authority (which he did not), he never exercised it in practice. Furthermore, plaintiff could not have prevented the issuance of checks simply by withholding his signature. In that event, during the first two quarters Hudlett could have had Schlender sign all checks requiring two signatures. During all six quarters Hudlett could have issued checks under $2,000 which required only his signature. Moreover, had plaintiff threatened to withhold his signature on a check, given Hudlett's degree of dominion and control over A & S, he could have convened a director's meeting and through approval of appropriate corporate resolutions changed the signature requirements on all corporate accounts to reflect that the President alone could sign and issue checks. Regardless of plaintiff's check signing authority, Hudlett, and not plaintiff, decided which creditors would be paid.

Plaintiff's check signing authority with A & S resembles that of the plaintiff in *Heimark v. United States*, 18 Cl.Ct. 15 (1989). In *Heimark*, the government contended that plaintiff's duty to co-sign checks gave him a "significant measure of control over the disbursal of ... funds." *Heimark v. United States*, 18 Cl.Ct. 15 (1989). However, the court in *Heimark* held that although that argument in theoretical terms was technically correct, the evidence presented at trial showed that plaintiff actually had no control over the disbursal of the corporation's funds since another corporate officer made all decisions respecting which creditors were to be paid. Further, the evidence showed that the plaintiff in *Heimark* did not feel he had the authority to direct which creditors would be paid. In these respects, the plaintiff in *Heimark* and plaintiff in this case are very similar. In both cases, the check signing authority was merely ministerial.

It is true that the courts in *Heimark v. United States*, 18 Cl.Ct. 15 (1989); *Burack v. United States*, 198 Ct.Cl. 855, 461 F.2d 1282 (1972), and *Bolding v. United States*, 215 Ct.Cl. 148, 565 F.2d 663 (1977), held that an individual who has check signing authority, where a limited number of individuals have such authority, *generally* will be held to be a responsible person. However, under the facts set forth above, the court concludes that plaintiff did not have actual authority to direct payment of funds to anyone, nor could he have, as a practical matter, prevented Hudlett from totally controlling all disbursement of funds. It is significant that plaintiff never attempted to exercise any authority he might have had to direct the payment of funds. For these reasons, plaintiff's ministerial check signing function is not sufficient, under these facts, to hold that plaintiff is a responsible person under I.R.C. § 6672 (1978).

Respecting the broader issue of overall financial control, the case of *Bauer v. United States*, 211 Ct.Cl. 276, 543 F.2d 142 (1976), is particularly on point. In *Bauer*, the plaintiff was held not to be a responsible person even though he was a member of the board of directors and was Vice-President of his corporation. The plaintiff in *Bauer*, was part owner of an established

---

**26.** Defendant contends in its pre-trial brief that the evidence will show "that plaintiff possessed and exercised control over the collection and payment of the federal employment taxes of A

& S, A & S Electrical, A–Emergency and Meccon." D.Br. at 18. However, at trial defendant introduced no credible evidence respecting plaintiff's control over such matters.

business which was merged into a larger business operation. Bauer's duties in both corporations were technical in nature and he had never been involved in the financial affairs of either the predecessor corporation or the merged corporation. Moreover, like plaintiff, Bauer continued to perform the same functions under the new merged company as he did in the predecessor organization. He also took out personal loans in order to help fund his financially troubled company. Bauer, like plaintiff, had no custody or control of the corporate books and records. While Bauer had the authority to sign checks and had signed bank signature cards, he never did sign checks. Although plaintiff in this case had the authority to sign checks, and did so, he signed stacks of checks, normally in blank and at no time had any real power to determine the amounts or the payees of the checks he signed.[27]

Defendant also relies on plaintiff's corporate title as Vice–President in support of its position that plaintiff is a responsible person. However, the case of *Godfrey v. United States*, 748 F.2d 1568 (Fed.Cir.1987) holds that courts should look through corporate titles to determine what actual authority, in a practical sense, the individual had over the financial affairs of the company. As previously stated, the corporate titles given to plaintiff were meaningless. They had no relation to plaintiff's limited responsibilities at A & S. As the court stated in *Heimark v. United States*, 18 Cl.Ct. 15, 23 (1989), "[t]he inquiry must focus on actual authority to control, not on titles or trivial duties." In this case, plaintiff's titles as Vice–President, Treasurer and later additionally as Secretary, bore no relation to his actual authority over financial affairs and disbursal of corporate funds, which in practice was so limited as to be almost non-existent.

Defendant further relies on the case of *Burack v. United States*, 198 Ct.Cl. 855, 461 F.2d 1282 (1972). However, that case is readily distinguishable on the facts in-

volved. The plaintiff in *Burack* was also a Vice President of the corporation there involved. However, he was aware of and directly concerned with the financial aspects of the corporation, had the authority to co-sign checks, and had significant authority to control finances. Clearly the plaintiff in *Burack* had much more control over corporate financial affairs and disbursal of corporate funds than did plaintiff in this case.

Based upon the persuasive evidence presented by plaintiff, which stands unrebutted by substantial and credible evidence adduced by defendant, the court finds that the plaintiff has shown by a preponderance of the evidence that he did not have the duty to collect, truthfully account for and pay over the employees' taxes to the IRS and, therefore, was not a "responsible person" within the meaning of I.R.C. § 6672 (1978).

### B. Willfulness.

Since this court has found that plaintiff has clearly met its burden of showing that he was not a responsible person, it need not address the question of whether or not plaintiff acted willfully or with reckless disregard of a "duty" to pay over trust fund employment taxes to the Government. However, assuming *arguendo* that plaintiff was a responsible person, then the question arises as to whether plaintiff acted willfully or recklessly in disregard of his duty. The United States Supreme Court has held that the willfulness requirement under I.R.C. § 6672 (1978), is "strong evidence that it [I.R.C. § 6672 (1978)] was not intended to impose liability without personal fault." *Slodov v. United States*, 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978). The Claims Court has interpreted willfulness to include a situation in which a responsible person makes a deliberate choice to pay other creditors instead of the Government, or a situation where a responsible person's ac-

---

**27.** That power and the exercise of it remained in Hudlett. In *Bauer*, the plaintiff had some degree of control over which creditors to pay after he arguably learned of tax delinquencies.

In this case, however, plaintiff never had any input as to which creditors to pay or control over the payment. Plaintiff is less of a responsible person than was Bauer.

tions exhibit a reckless disregard of his duty. *Powell v. United States,* 9 Cl.Ct. 58, 62 (1985). However, the Federal Circuit has cautioned that the responsible person must have actual notice of the current delinquency to establish a duty to act. *Godfrey v. United States,* 748 F.2d 1568, 1578 (Fed.Cir.1984). Although a responsible person need not have an actual intent to defraud the United States in order to be found willful, a responsible person nevertheless may prevail by showing the absence of a reckless disregard of a duty to pay the taxes. This requires proof by a plaintiff who is a responsible person of the absence of *one* of three elements: (1) the responsible person's knowledge that taxes were not paid; (2) a reasonable opportunity to discover and remedy the problem, or (3) a failure to undertake reasonable efforts to ensure payment. *Hammon v. United States,* 21 Cl.Ct. 14 (1990). With these elements in mind, the court will analyze the facts in this case.

■ Regarding the first element, the evidence adduced at trial convincingly establishes that plaintiff did not actually learn of the tax delinquencies until January 17, 1984. While Hudlett and Rendazzo testified that they routinely informed plaintiff of the financial matters of the corporation, the court finds that their testimony in this regard was totally lacking in credibility.[28] Their testimony was in direct conflict with plaintiff's and Jastrow's testimony on this point, which the court finds was highly credible and persuasive and, therefore, controlling on this issue.[29] After plaintiff learned of the tax deficiency on January 17, 1984, he admonished Hudlett to pay the taxes to the Government and received Hudlett's assurance that he, Hudlett, would take care of the taxes and other debts. Plaintiff had always relied on Hudlett to take care of the financial arrangements of A & S. Since he had no reason to believe that that reliance was misplaced, it was entirely reasonable for plaintiff to rely on Hudlett's assurances that the taxes would be paid. In short, Hudlett's assurances successfully laid to rest plaintiff's concerns. Since plaintiff, in good faith, believed the taxes were being paid, the court finds that he did not have the requisite knowledge of non-payment of the taxes.

■ Respecting the second element, the evidence shows that plaintiff never had access to or control of the books and records of A & S. They were kept under lock and key in Rendazzo's office. Further, to the extent plaintiff could have gained access to the books, he did not have the financial sophistication to understand the books, even assuming they were up-to-date and in proper form.[30] The court seriously doubts that plaintiff had the authority to hire an outside accountant to check the books had he suspected that the taxes were delinquent. Even if plaintiff had such authority, any such independent auditor could not have accurately ascertained with any real degree of certainty the exact financial and tax problems facing A & S. This is especially true in light of Bartlett's testimony that he, as an accountant, could not clearly understand the books and records kept by Rendazzo. They were simply too shoddy and poorly kept to have been comprehensi-

28. The testimony of Rendazzo was presented through her videotaped deposition. The court carefully listened to and watched all of her deposition. Her memory was highly selective, internally inconsistent, and not persuasive. Therefore, the court chooses to give her testimony almost no weight in resolving any of the issues in this case.

29. Jastrow was the only employee of A & S, with the possible exception of Schlender, who observed the office practices of the other employees of A & S and who has no direct interest in the outcome of this proceeding. Unlike Rendazzo, there is no possibility that she could be found to be a responsible person. The court finds the testimony of Jastrow to be the most probative and believable on the issues of whether plaintiff was a responsible person and when plaintiff first learned of the tax delinquencies.

30. As previously noted, the evidence shows that even if plaintiff had attempted to ascertain the true financial condition of A & S, he could not have easily done so because the books and records were kept under lock and key in Rendazzo's office. Moreover, because of his lack of knowledge and the poor condition of the books and records, plaintiff could not have understood them if he had obtained them. Even Dean Bartlett, A & S's accountant, had difficulty making sense of them.

ble to plaintiff. Therefore, the court finds that plaintiff had no reasonable opportunity to discover and remedy the problem.

 Respecting the third element, once plaintiff learned of the tax delinquency on January 17, 1984, he attempted to ensure payment of the taxes. The Seventh Circuit has admonished:

> [I]f a responsible officer [which plaintiff was not] knows that the corporation has recently committed such a delinquency and knows that since then its affairs have continued to deteriorate, he runs the risk of being held liable if he fails to take any steps either to ascertain, before signing checks, what the state of the tax withholding account is, or to institute effective financial controls to guard against nonpayment.... It is not enough that he left it all to ... [another officer] without even inquiring from him what steps would be taken to prevent a repetition of the tax delinquency....

*Wright v. United States*, 809 F.2d 425, 428 (7th Cir.1987). This description does not fit plaintiff. Plaintiff asked Hudlett what was being done about the overdue withholding taxes and received Hudlett's unequivocal assurance that A & S would be paying the taxes with funds generated from current and upcoming projects. It was entirely reasonable for plaintiff to believe Hudlett at that time, based upon his prior experience with and trust in Hudlett. In fact, A & S had always repaid plaintiff on his personal loans to A & S. Additionally, on February 1, 1984, plaintiff personally borrowed $15,000 in order to help pay the $18,000 tax bill.[31]

Plaintiff could have left A & S in February 1984, taken his numerous customers with him, and perhaps have entirely avoided tax litigation associated with A & S or its subsidiaries. However, plaintiff exhibited good faith by staying on and attempting to pay the IRS and other creditors. Unfortunately, plaintiff did not have sufficient knowledge or control of the company to know what financial safeguards were need-ed and to institute them to avoid further non-payment of taxes. Lastly, plaintiff inquired vehemently about Hudlett's plans to pay the outstanding taxes, and Hudlett, as the person in charge of the corporation, including the financial affairs, convinced plaintiff that they would be paid. Plaintiff showed his good faith through his efforts in the spring of 1984 to involve himself more and more with the company's bankers, particularly Jolliff, in order to avoid the demise of the corporation. The court is convinced that plaintiff acted reasonably to assure payment of the taxes and, in fact, given his very limited financial expertise and sophistication, could not have done more under the circumstances to assure such payment.

Defendant cites *Burack v. United States*, 198 Ct.Cl. 855, 461 F.2d 1282 (1972), to support its contention that plaintiff was willful as a matter of law since he signed corporate checks which were sent to other creditors after he knew of the tax delinquency to the IRS. Specifically, defendant relies on the following passage from *Burack:*

> A corporate officer *charged with safeguarding financial interests* should not, by a deliberate disregard of duties and responsibilities associated with such actually exercised power as signing all corporate checks, be able to defeat the statutory liability fixed upon responsible persons by pleading that he did not know what he was signing and that his action was therefore not "willful." [Emphasis added.]

*Burack v. United States*, 198 Ct.Cl. 855, 871, 461 F.2d 1282, 1292–93 (1972). However, plaintiff was not "charged with safeguarding financial interests," but was charged only with managing A & S's plumbing operations. Moreover, although plaintiff signed some corporate checks, it is clear that he did not sign these corporate checks except when requested to do so and mostly in blank—i.e., without knowledge of the payees or the amounts. Furthermore,

---

**31.** Plaintiff took out a $15,000 loan on February 1, 1984, which had a maturity date of May 1, 1984, to help pay the IRS after learning of the tax delinquencies. At this point A & S had no credit.

plaintiff did not act in deliberate disregard of his duties. Plaintiff dutifully oversaw the day to day operations of the plumbing business of A & S. As noted, when plaintiff found out about A & S's tax delinquencies, he admonished Hudlett to pay the taxes. Clearly, since plaintiff had no authority over the payment of taxes he could not have acted in willful disregard of any duty in this regard. In these circumstances, *Burack* is clearly inapposite.

Therefore, the court finds that plaintiff has proved the absence of all three of the above elements set forth in *Hammon.* Assuming that plaintiff was a responsible person, the court further finds that he has shown by much more than a mere preponderance of the evidence that he did not act willfully or in reckless disregard of a duty to pay the taxes due.

## II.

Defendant contends that this court lacks jurisdiction over a payment by plaintiff's bankruptcy trustee to the IRS in the amount of $5,544.19 on September 5, 1985, which the IRS applied against I.R.C. § 6672 (1978) penalties which were assessed against plaintiff on December 29, 1986 and January 5, 1987. Defendant contends that since plaintiff's claim was not filed within two years after the tax was "paid" the claim for this money is time barred. *See* I.R.C. § 6511(a) (1982).[32] Further, defendant contends that since the $5,544.19 was the property of the bankrupt's estate and the bankrupt's estate was the entity that paid the tax, only the bankrupt's estate has standing to sue for a refund of that amount. Therefore, defendant argues that plaintiff lacks standing to claim this refund.

Plaintiff argues that this issue is an affirmative defense and therefore was waived when defendant did not raise it until the pre-trial briefing. Further, plaintiff argues that since the bankrupt's estate was closed before suit was filed for a tax refund, the funds paid to the IRS were the property of plaintiff at the time he sued. Therefore, plaintiff argues he, as owner of the funds at the time of suit, is the real party in interest and has standing. Moreover, plaintiff argues that the $5,544.19 was not "paid" for purposes of I.R.C. § 6511 (1982), until the date of defendant's assessment. Therefore, plaintiff contends that its suit for the recovery of the $5,544.19 is within the applicable two year statute of limitations.

### A. Waiver.

■ RUSCC 12(h)(3) provides:

Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

In tax refund suits in the Claims Court, the timely filing of a claim is a condition precedent to this court's jurisdiction.[33] *Trout v. United States,* 1 Cl.Ct. 219, 221 (1983). Indeed, the statute of limitations is jurisdictional, and may not be waived. *Soriano v. United States,* 352 U.S. 270, 273–74, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957); *Cosmic Construction Co. v. United States,* 697 F.2d 1389, 1390 (Fed.Cir.1982); *AAAA Enterprises, Inc. v. United States,* 10 Cl.Ct. 191, 193 (1986); *Trout v. United States,* 1 Cl.Ct. 219, 221 (1983). Therefore,

32. I.R.C. § 6511(a) (1982), provides that "[c]laim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return if filed by the taxpayer, within 2 years from the time the tax was paid. Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid."

33. I.R.C. § 7422(a) (1982), provides: "No suit ... shall be maintained in any court for the recovery of any ... tax ... erroneously ... collected ... or in any manner wrongfully collected, until a claim for refund ... has been *duly filed....*" (Emphasis added). *Trout v. United States,* 1 Cl.Ct. 219, 221 (1983). Therefore, filing a claim within the period allowed under the statute of limitations is a prerequisite to satisfying the tax jurisdiction of this court under I.R.C. § 7422 (1982).

defendant has not waived the defense of the statute of limitations in this case.

B. Standing.

I.R.C. § 6402(a) (1981) provides:

In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (c) and (d), refund any balance to such person.

Defendant contends in its post-trial brief that the IRS is authorized to pay refunds "only" to the person who made the overpayment, citing I.R.C. § 6402(a) (1981). Furthermore, defendant argues that the payment made out of the bankrupt's estate belongs to the bankrupt's estate even though it was previously closed.

[redacted] Our analysis of this issue starts with 11 U.S.C. § 346 which provides, in part, that:

(a) Except to the extent otherwise provided in this section, subsections (b), (c), (d), (e), (g), (h), (i), and (j) of this section apply notwithstanding any state or local law imposing a tax, *but subject to the Internal Revenue Code of 1954 (26 U.S.C. 1 et seq.).* [Emphasis added.]

* * * * * *

(i)(1) In a case under Chapter 7, 12, or 11 of this title concerning an individual, the estate shall succeed to the debtor's tax attributes, including—

* * * * * *

(B) any recovery exclusion;

* * * * * *

(F) any claim of right.

(2) After such a case is closed or dismissed, the debtor shall succeed to any tax attribute to which the estate succeeded under paragraph (1) of this subsection but that was not utilized by the estate....

Thus, 11 U.S.C. § 346(a) establishes that federal tax law governs the transfer of federal tax attributes between a debtor and a bankrupt's estate. That transfer is governed by I.R.C. § 1398 (1954), which provides, in part:

(a) *Cases to Which Section Applies.*— ... this section shall apply to any case under chapter 7 (relating to liquidations) or chapter 11 (relating to reorganization) of title 11 of the United States Code in which the debtor is an individual.

* * * * * *

(g) *Estate Succeeds to Tax Attributes of Debtor.*—The estate shall succeed to and take into account the following items ... of the debtor—

(1) *Net operating loss carryovers.*—The net operating loss carryovers determined under section 172.

(2) *Charitable contributions carryovers.*—The carryover of excess charitable contributions determined under section 170(d)(1).

(3) *Recovery exclusion.*—Any recovery exclusion under section 111 (relating to recovery of bad debts, prior taxes, and delinquency amounts).

(4) *Credit carryovers, etc.*—The carryovers of any credit, and all other items which, but for the commencement of the case, would be required to be taken into account by the debtor with respect to the credit.

(5) *Capital loss carryovers.*—The capital loss carryover determined under section 1212.

(6) *Basis, holding period, and character of assets.*—In the case of any asset acquired (other than one by sale or exchange) by the estate from the debtor, the basis, holding period, and character it had in the hands of the debtor.

(7) *Other attributes.*—Other tax attributes of the debtor, to the extent provided in regulations prescribed by the Secretary as necessary or appropriate to carry out the purposes of this section.

* * * * * *

(i) *Debtor Succeeds to Tax Attributes of Estate.*—In the case of a termination of an estate, the debtor shall succeed

to and take into account the items referred to in paragraphs (1), (2), (3), (4), (5), and (6) of subsection (g) in a manner similar to that provided in such paragraphs (but taking into account that the transfer is from the estate to the debtor instead of from the debtor to the estate). In addition, the debtor shall succeed to and take into account the other tax attributes of the estate, to the extent provided in regulations prescribed by the Secretary as necessary or appropriate to carry out the purposes of this section.

■ Clearly plaintiff's "claim of right" to the $5,544.19 is not a listed tax attribute under I.R.C. § 1398 (1954). Also, it is undisputed that the Secretary has not prescribed regulations which would cover plaintiff's situation. This is why plaintiff has requested this court to fashion its own rules to interpret I.R.C. § 1398 (1954), in the absence of the IRS's promulgation of such rules, citing *Estate of Maddox v. Commissioner*, 93 T.C. 228 (1989) and *First Chicago Corp. v. Commissioner*, 88 T.C. 663 (1987). However, in those cases, Congress had required the Secretary to issue regulations by using the imperative "shall." In this case, the statute *authorizes* the Secretary to prescribe regulations "as necessary or appropriate" to carry out the purpose of the statute. Given the clearly listed, specific tax attributes found in I.R.C. § 1398 (1954), coupled with the permissive language of the congressional statute, this court finds that it is not required to fashion rules or regulations to implement a statute which conveys a plain meaning without such rules and regulations.

■ Plaintiff next argues that since the case of *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), gives the bankrupt's estate the right to make claims for refund of taxes paid for or on behalf of the debtor, and since the bankrupt's estate has been terminated, the rights or property not administered by the estate and not

specifically reserved to its use are returned to the debtor. 11 U.S.C. § 554(c). 11 U.S.C. § 554(c) and (d) provide:

(c) Unless the court orders otherwise, *any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case* is abandoned to the debtor and administered for purposes of section 350 of this title. [Emphasis added.]

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

As a result, the issue now is whether the property has been abandoned by the bankrupt's estate which, in part, turns on the issue of whether the property was scheduled under 11 U.S.C. § 521.[34] The court, at this point, has no evidence of record which would prove that this property was "scheduled" under 11 U.S.C. § 521. Defendant argues that plaintiff did not marshall forth such evidence at trial, and that it should not be allowed to do so now. Plaintiff argues that he should be permitted to produce authenticated copies of documents from the bankruptcy proceeding under RUSCC 44(a) and the holding in *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

However, a careful examination reveals that neither RUSCC 44 nor the *Blonder–Tongue* case support plaintiff's argument. Nevertheless, this court is reluctant to foreclose plaintiff from proving his standing before this court respecting his claim for the $5,544.19 payment when it was not reasonable for plaintiff to believe that during trial such proof would be necessary. Indeed, plaintiff's only notice that this particular issue of "scheduling" would be pertinent came after trial. Defendant did not raise this issue directly in its pre-trial brief, but only made the argument that plaintiff's claim was not timely filed under I.R.C.

---

**34.** 11 U.S.C. § 521 provides: "The debtor shall— (1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, and a statement of the debtor's financial affairs. . . ."

§ 6511 (1982), and that plaintiff did not have standing under 11 U.S.C. § 541.

### C. Statute of Limitations.

█ Assuming *arguendo* that plaintiff can prove that the property was properly scheduled and that the $5,544.19 payment to the IRS was abandoned to the debtor at the close of the bankruptcy proceeding, his claim would be timely filed under I.R.C. § 6511 (1982), the applicable statute of limitations. In this case, $5,544.19 was sent by the bankruptcy court to the Commissioner of the IRS on September 4, 1985. The deficiency was assessed on December 29, 1986 and January 5, 1987. Suit was filed on September 30, 1988. The issue is whether the Commissioner's receipt of $5,544.19 from the bankruptcy court on September 4, 1985 constituted "payment" of tax for purposes of I.R.C. § 6511 (1982), or whether it was a mere deposit to stop the running of interest. If the plaintiff's remittance was merely a deposit, this portion of the claim is timely filed under I.R.C. § 6511 (1982).

The leading case of whether a transfer of money to the IRS is to be classed as a "payment" under I.R.C. § 6511 (1982), is *Rosenman v. United States*, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945). In *Rosenman*, the United States Supreme Court held that the plaintiff, who deposited estimated estate taxes with the Commissioner prior to assessment, and who disputed the proposed assessment, had not made a payment but had merely made a deposit. The Supreme Court noted that, in general, a tax deposit made prior to the actual assessment, is not a "payment."

Cases subsequent to *Rosenman* have seemingly expanded the concept of "payment," but under these cases, the bankrupt's estate's placement of money in the hands of the Commissioner is still a deposit, and not a payment. The case of *Charles Leich and Co. v. United States*, 165 Ct.Cl. 127, 329 F.2d 649 (1964), is illustrative of this difference. In that case the Court of Claims held that "a remittance made by a taxpayer of an amount shown in good faith to be due on its tax return or given in response to an assessment of taxes by the IRS is a payment of tax." *Charles Leich and Co. v. United States*, 165 Ct.Cl. 127, 133, 329 F.2d 649, 652 (1964). However, the court also held that where the taxpayer contests a proposed assessment, there is no payment. Similarly, in *Northern Natural Gas Co. v. United States*, 173 Ct.Cl. 881, 354 F.2d 310 (1965), the Court of Claims held that *Rosenman* is distinguishable when a taxpayer makes a voluntary remittance based upon a *bona fide* estimate of an uncontested tax liability. But, if the taxpayer opposes a proposed liability, *Rosenman* applies.

It is clear from the undisputed facts in this case that, at the time of remittance to the IRS, there was only a proposed assessment. Further, the remittance was a deposit to stop the accrual of interest and to protect other interests of the bankrupt's estate. Moreover, prior to the bankruptcy court's making the remittance, plaintiff filed a written protest to all four proposed assessments. Therefore, since the remittance was not voluntary, the proposed assessment was contested, and the assessment was not actually imposed until months later, this $5,544.19 remittance on September 5, 1985 was not payment for the purposes of I.R.C. § 6511 (1982).

The court finds that although plaintiff's claim for $5,544.19 is not barred by the statute of limitations, further proceedings will be necessary to determine whether those funds were properly scheduled by plaintiff as a debt and subsequently abandoned to plaintiff.

### CONCLUSION

For the reasons stated in this Opinion, the court finds that plaintiff was not a "responsible person" under I.R.C. § 6672 (1978), but even if plaintiff was a "responsible person," he has proved convincingly that he was not willful or in reckless disregard of any "duty" to pay over trust fund taxes to the Government. The court by separate order will schedule a status conference to address the need for further proceedings to permit plaintiff to provide documentation regarding the abandonment

issue addressed in this Opinion. The court will then resolve this issue and enter judgment in accordance with this Opinion.