James L. TEETS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–488T.

United States Court of Federal Claims.

Aug. 5, 1993.

Reissued Sept. 2, 1993 *.

Order Granting Reconsideration
in Part Nov. 10, 1993.

---

* This opinion was originally issued without publication. Defendant moved for reissuance as a published opinion. For good cause shown, the motion is granted.

Michael E. Greene, Coral Springs, FL, for plaintiff.

Elizabeth K. Wickstrom, with whom was Arthur Hoene, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff seeks a refund of monies he paid toward the one hundred percent tax penalty assessed against him pursuant to I.R.C. §§ 6671 and 6672 as a responsible person with respect to trust fund taxes owed by H & T Contractors, Inc. ("H & T"). The Government counterclaims, seeking judgment as to plaintiff's liability for the balance of the penalties assessed for the first and second quarters of 1989.[1] Following a trial on the merits, we hold that plaintiff is liable for the penalties assessed against him for both the first and second quarters of 1989.

## FACTS

Plaintiff formed H & T in conjunction with R & H Aggregates, Inc. ("R & H") on June 15, 1982, as an underground utility contracting company. The initial shareholders were plaintiff, who owned a one-third share, and R & H, which owned a two-thirds share. Three months later, Donald Hughes and Harold Rusbridge, the shareholders of R & H, cancelled R & H's shares and each became one-third shareholders of H & T.[2] Plaintiff's expertise was in supervising field operations, Hughes was skilled in estimating and bidding projects, and Rusbridge had experience with equipment sales.

From the inception of H & T to its bankruptcy, plaintiff served as both President and a member of the board of directors. This was despite the fact that Teets had no real business or management experience. The other two organizers thought Teets should be President, so he agreed to assume that title. Hughes served as Secretary/Treasurer, and Rusbridge was named Vice–President.[3]

Article III, section 2 of H & T's corporate bylaws defined Teets' duties as President:

*Duties.* The officers of this corporation shall have the following duties:

The President will be the chief executive officer of the corporation, who generally and actively manages the business and affairs of the corporation subject to the directions of the Board of Directors.

Article II, section 1 of the corporate bylaws describe the function of the board of directors at H & T as follows: *"Function.* All corporate powers, business, and affairs will be exercised, managed and directed under the authority of the Board of Directors." No formal directors' or officers' meetings were held, however. The three men met informally on weekday mornings and Saturdays to discuss business, but no minutes were kept. The important financial decisions were made by a consensus of the three owners. All three were signatories on the company's accounts.[4] Two signatures were required on each check.

Day-to-day duties of the officers depended in part upon the projects each handled and the availability of the owners. The majority of plaintiff's daily duties followed from his field expertise, and thus he spent much of his time at various worksites. He would, however, enter the office early each morning to meet with the other owners,

---

**1.** The Government also sought judgment as to plaintiff's liability for the fourth quarter of 1988. However, during post-trial argument, counsel revealed that plaintiff's liability for that quarter has been satisfied.

**2.** H & T stands for "Hughes & Teets."

**3.** Plaintiff, Hughes and Rusbridge also jointly owned some affiliate corporations: Quad Four, Inc. was formed in 1986 to own a twenty-four unit condominium complex; R.H.T., Inc. was formed to rent space to H & T for storage of heavy equipment; and H.D.J., Inc. was formed to own the warehouse that served as H & T's principal office. Plaintiff served as President of Quad Four and Vice–President of both R.H.T. and H.D.J.

**4.** Later in the company's existence, Tommy Mathison, the chief estimator, had check-signing authority on the company bank account.

sign checks and make plans, and he returned to the office most evenings to handle matters that had arisen during the day.

By 1986, H & T had, from very modest beginnings, become a complete site development contractor engaged in the construction and installation of golf courses, lakes, sanitary sewers, water mains, storm draining, and roadways. With projects in Dade, Broward, West Palm Beach, and Martin counties, H & T's annual sales volume grew to over $16,000,000.00. Despite H & T's growing sales volume, however, financial problems began to plague the business. Bills were late in being paid. Creditors complained and subcontractors threatened to stop work. Payments for payroll and excise taxes were usually behind. In 1988, a change was made in the Florida mechanics' lien law. The new law required contractors to pay their suppliers and subcontractors in advance. At that time, H & T started paying creditors only as deemed necessary to keep the business going.

The financial problems at H & T stemmed in part from the lavish spending habits of Hughes and Rusbridge. Hughes took extravagant vacations abroad, pulling out several weeks' salary in advance and billing expenditures on H & T's American Express card. In April 1987, plaintiff requested that Hughes and Rusbridge stop using the card, which was already at the maximum. Hughes and Rusbridge agreed, but over Teets' objection, they raised the officer's weekly salaries by $1,000, saying that they could not live on their salary of $1,400 per week. Thus, from April 1987 on, the three received equal salaries of $124,800 per year.[5] About that same time, plaintiff approached Rusbridge and offered to buy out his stock, but Rusbridge refused. In early 1989, when told that without an influx of capital the company faced bankruptcy, Teets suggested that the owners take a cut in salary. This idea was also rejected. Whenever plaintiff complained

about H & T's debt and the other shareholders' waste of corporate funds, Rusbridge and Hughes assured him that there was nothing to worry about financially because H & T had sufficient assets to pay its creditors if it ever had to go out of business, and would have money left over.

Meanwhile, the financial condition of the company worsened. As of March 1988, H & T had fallen several periods behind in making its federal tax deposits. In January 1989, the IRS levied on H & T's account at Suburban Bank in satisfaction of the company's payroll tax liability for the first quarter of 1988. When the levy was discussed, Hughes and Rusbridge again assured plaintiff that there was nothing to worry about because of the value of H & T's assets. By the fourth quarter of 1988 and the first two quarters of 1989, H & T had virtually stopped making timely federal tax deposit payments. On January 31, 1989, plaintiff signed H & T's Form 941 employment tax return for the fourth quarter of 1988, which reflected that no payments for that quarter had been made although there was a balance due of $229,687.47. Similarly, on April 28, 1989, plaintiff signed the Form 941 tax return for the first quarter of 1989, which reflected total tax deposits of $10,268 for that quarter and an unpaid balance of $203,569.59.[6]

During the first and second quarters of 1989, IRS officials made phone calls and visits to H & T's offices to obtain the funds. Al Parker, the company controller, Sandra Budd, H & T's bookkeeper, and Rusbridge all dealt with IRS agents. Plaintiff testified that he did not. The IRS also sent numerous notices to H & T demanding payment for the taxes withheld from the employees' pay. On June 12, 1989, the IRS sent the company a Request for Payment for the tax period ending March 31, 1989.[7] The Request states, in

---

**5.** The court notes, however, that after being overruled, plaintiff accepted his raise.

**6.** On January 11, 1989, plaintiff signed the check for the only payroll tax deposit made

during the entire first quarter of 1989, a $10,268.06 check to Suburban Bank.

**7.** In addition to the request dated June 12, 1989, the record contains five other notices that H &

part, "[a] portion of the penalty shown below is because your tax deposits were not made in sufficient amounts by the dates required." The amount requested was $228,859.39. Budd testified that at least with regard to two such requests, she made four copies of the notices and distributed them to Parker and each of the three owners.[8]

In July 1989, H & T hired Byron Kreiger, a tax specialist, to work out a payment plan between H & T and the IRS. Kreiger testified that he first met with Teets and the other owners on July 10, 1989. During that meeting, he discussed the problem of the company's arrearage, the idea of negotiating an installment plan to prevent another IRS levy, and the importance of making current employment tax deposits. He stated that because he was hired for the express purpose of taking care of employment tax problems, he felt that the owners "were all aware of the problem and were all there waiting for me to come to their assistance." Transcript of trial held May 4–6, 1993 ("Tr.") at 965–66. On August 4, 1989, B.D.O. Seidman, an accounting firm, completed an audit of H & T for "the stockholders" in which it was noted that "the Company did not pay all of the federal payroll taxes for the quarter ended June 30, 1989. Such additional amounts approximates [sic] $203,000 in taxes, plus interest and penalties, if any."

In the fall of 1989, Parker filled out a Form 4180, "Report of Interview Held with Persons Relative to Recommendation of 100–Percent Penalty Assessments," for each of the three shareholders in accordance with then-standard IRS procedure. Parker conducted plaintiff's interview on September 28, 1989, in the presence of IRS agent Mike Turaniczo, who was in charge of investigating H & T. The interview form reads, in part, as follows:

Q. Were any other obligations paid during the period that tax liabilities were accruing?

A. Yes.

Q. Who authorized or allowed these other obligations to be paid?

A. All three stockholders.

Plaintiff's signature appears at the bottom of the form.

On October 25, 1989, the three owners signed an installment agreement with the IRS that provides that "the undersigned agrees that the federal taxes [in the total amount of $614,440.84 plus accruals for the fourth quarter of 1988, and the first two quarters of 1989] will be paid as follows: $100,000.00 to be paid on November 3, 1989, and $100,000.00 to be paid on the 15th of each month thereafter until the liability is paid in full." The first payment was applied to the liabilities for the third quarter of 1989. A subsequent payment, on November 3, 1989, of $100,000 was applied to the last quarter of 1988 with priority to portions other than the trust fund.[9] On the same day, plaintiff received a Form 2749 "Request for 100% Penalty Assessment," threatening him with a penalty assessment if H & T's withholding taxes were not paid. On December 1, 1989, Parker negotiated an agreement with the IRS that the penalty would not be imposed if H & T honored its October 25, 1989, agreement with the IRS. H & T filed for bankruptcy on December 31, 1989.

A Form 4340 "Certificate of Assessments and Payments," dated October 10, 1992, reflects that plaintiff was assessed a "Miscellaneous penalty" totalling $492,-

T received from the IRS regarding employment taxes:

(1) A Final Notice (Notice of Intention to Levy) dated December 5, 1988, for the period ended June 30, 1988;

(2) A Final Notice (Notice of Intention to Levy) dated January 9, 1989, for the period ended September 30, 1988;

(3) A Request for Payment dated March 20, 1989 for the period ended December 31, 1988;

(4) A Final Notice (Notice of Intention to Levy) dated April 10, 1989, for the period ended December 31, 1988; and

(5) A Final Notice (Notice of Intention to Levy) dated July 24, 1989, also for the period ended December 31, 1988.

**8.** *But see infra* note 15.

**9.** H & T made another payment of $100,000 on November 15, 1989, in accordance with the agreement.

849.40 on February 19, 1990, of which $233,658.53 was abated the same day. In its original counterclaim, the United States sought judgment against plaintiff in the amount of $255,726, less any amounts collected by the IRS on or after November 2, 1992. Subsequently, the IRS collected $35,399.64 from H & T and $73,541.61 from plaintiff. By motion of July 23, 1993, the Government amended its pleadings to further reduce the amount of the counterclaim by $121,908.24 to conform to evidence presented at trial. Thus, the Government presently seeks $24,876.51 plus statutory interest and additions as provided by law.

## DISCUSSION

██ Employers must withhold FICA and income taxes from their employees' wages. I.R.C. §§ 3102(a), 3402(a) (1989). The withholdings are to be kept in trust for the United States. I.R.C. § 7501(a). One way the Government may enforce the trust is by assessing a one hundred percent penalty against responsible corporate officials who willfully fail to ensure that the tax is properly withheld, accounted for and paid over. I.R.C. § 6672.[10] Section 6671(b) defines the persons who may be held liable for the penalty:

The term "person", as used in this sub-chapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

10. Section 6672 provides as follows:
 **Failure to collect and pay over tax, or attempt to evade or defeat tax**
 (a) **General Rule.**—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

11. The *Godfrey* court expressed the elements of liability for the trust fund tax penalty as follows:

I.R.C. § 6671(b). An individual is liable for the one hundred percent penalty only upon a showing that he is responsible for failing to pay over trust fund taxes and that his failure to pay was willful. *Davis v. United States*, 961 F.2d 867, 869–70 (9th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 969, 122 L.Ed.2d 124 (1993); *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984).[11]

### I. The Presumption of Correctness

██ The Government may establish a prima facie case as to a taxpayer's liability for the penalty under § 6672 by presenting the assessment of liability against him as a responsible person for the willful failure to collect, account for, or pay over taxes withheld from employees. *Ruth v. United States*, 823 F.2d 1091, 1092 (7th Cir.1987). A certified copy of the taxpayer's "Certificate of Assessments and Payments" is "routinely used to prove that a tax assessment has in fact been made." *Rocovich v. United States*, 933 F.2d 991, 994 (Fed.Cir. 1991); see also *Dougherty v. United States*, 18 Cl.Ct. 335, 350 (1989), aff'd without op., 914 F.2d 271 (Fed.Cir.1990); *Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985). Courts generally do not "look behind an assessment to evaluate the procedure and evidence used in making the assessment," but instead "conduct a de novo review of the correctness of the assessment, imposing the risk of nonpersuasion on the individual." *Ruth*, 823 F.2d at 1094. Only in limited circumstances, i.e., when shown to be without rational foundation or arbitrary and erroneous, will the assessment not be accorded a rebuttable pre-

[A] person is subject to a 100 percent penalty if he satisfies two separate statutory requirements. First, he must be under a duty to 'perform the act in respect of which the violation occurs,' (§ 6671(b)) and that duty 'to collect, truthfully account for, and pay over' any taxes (§ 6672). Such a person is a 'responsible person.' Second, the 'responsible person' must have 'willfully' failed to collect, truthfully account for, and pay over, or have 'willfully' evaded or defeated the tax or tax payment.... [B]oth statutory requirements must be present for the 100% penalty to be imposed."
*Godfrey*, 748 F.2d at 1574.

sumption of correctness. *Id.; see also United States v. Janis*, 428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976) (holding that an assessment is invalid only if it is utterly without rational foundation). Once a proper assessment has been offered, the burden shifts to plaintiff to prove "by a preponderance of the evidence that the assessment made against him was erroneous, i.e., that he was either not a 'responsible person,' or that he did not act 'willfully' in failing to discharge his duties as a 'responsible person.'" *Dougherty*, 18 Cl.Ct. at 350; *Pototzky*, 8 Cl.Ct. at 315; *see also Ruth*, 823 F.2d at 1092.

■ Plaintiff does not dispute that an assessment was made. Nor was there evidence to support his pretrial contention that the assessment was merely "a shot in the dark" or without a rational foundation.[12] During post-trial argument, counsel conceded that plaintiff had notice of the assessment against him. Yet plaintiff maintains that the assessment is invalid because (1) the "Summary Record of Assessment" did not constitute a "copy of the record of assessment" under I.R.C. § 6203 since it did not itemize the assessment against him by quarters corresponding to the quarters in which H & T's trust fund withholdings became due; and (2) the

amount of the assessment as reflected in the Certificate of Assessments and Payments introduced at trial was overstated, and the Government's attempt to provide the correct amount after trial goes beyond the record. Therefore, plaintiff maintains, the assessment against him is so technically flawed as to vitiate the presumption of correctness that normally attaches to an IRS assessment.[13] We address plaintiff's arguments separately.

### A. Failure to itemize the amount assessed by quarters

■ The proper method for assessing taxpayers is treated in 26 U.S.C. § 6203 and its corresponding Treasury Regulation, § 301.6203–1 (1989). Those sections provide, in part, as follows:

§ 6203 **Method of assessment.** The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary.

§ 301.6203–1 **Method of assessment.** The assessment shall be made by an assessment officer signing the summary record of assessment. The summary record, through supporting records, shall provide identification of the taxpayer, the

---

12. Agent Turaniczo testified that in making the determination of who had the final word as to which creditors H & T would pay, he relied not only on plaintiff's Form 4180, but also on "financial documentation,—tax returns, checking accounts, bank accounts, [and] testimony from other individuals." It is undisputed that plaintiff was President, one-third shareholder, and signatory on H & T's accounts.

13. As a separate matter, plaintiff contends that the IRS improperly applied installment payments made by H & T first to the non-trust fund portion of the company's debt rather than to the trust fund portion as the IRS and H & T had agreed. A taxpayer submitting a voluntary payment may designate the liability to which money should be applied. *Davis*, 961 F.2d at 878; *Becker v. United States*, 84–2 U.S. Tax Cas. (CCH) ¶ 9709, 1984 WL 178668 (N.D.Cal.1984). But involuntary tax payments may be credited as the IRS desires regardless of the taxpayer's wishes. *Davis*, 961 F.2d at 878–79. Also, if a taxpayer making a voluntary payment fails to target funds to any specific liability, the IRS may allocate the funds as it sees fit. *Sotir v. United States*, 978 F.2d 29, 30 (1st Cir.1992),

cert. denied, —— U.S. ——, 113 S.Ct. 1388, 122 L.Ed.2d 762 (1993); *Davis*, 961 F.2d at 878; *Hammon v. United States*, 21 Cl.Ct. 14, 29 (1990). IRS procedure requires that the taxpayer making a voluntary payment must present any specific allocation requests in writing. The Claims Court has held that where no written application was made and the plaintiff did not inform the IRS of any disagreement when notified of the allocation to preexisting delinquencies about which the plaintiff later complained, the plaintiff is barred from contesting the allocation. *See Hammon*, 21 Cl.Ct. at 29.

At trial, Byron Kreiger, H & T's special tax consultant with thirty-four years of IRS experience, testified that payments made on an installment plan are not voluntary but involuntary payments which cannot be earmarked by the taxpayer. Mike Turaniczo testified that it was the IRS's policy not to permit taxpayers to both designate payments and negotiate a payment plan. Furthermore, plaintiff presented no evidence that H & T had made a specific allocation request in writing. Thus, under the circumstances, there could have been no agreement to permit the earmarking of payments.

character of the liability assessed, the taxable period, if applicable, and the amount of the assessment.... If the taxpayer requests a copy of the record of assessment, he shall be furnished a copy of the pertinent parts of the assessment which set forth the name of the taxpayer, the date of the assessment, the character of the liability assessed, the taxable period, if applicable, and the amounts assessed.

Section 301.6203–1 "do[es] not require the summary record to be of exacting specificity, as long as that record is backed by supporting documents providing adequate notice to the taxpayer." *Gentry v. United States*, 962 F.2d 555, 557 (6th Cir.1992); *see also Curley v. United States*, 791 F.Supp. 52, 55 (E.D.N.Y.1992). Plaintiff received an itemized notice of the periods for which the IRS was assessing him as early as November 1989, when he received the Request for 100–Percent Penalty Assessment. Thus, if the IRS had an obligation to inform plaintiff of the specific quarters for which the penalty was being assessed against him, he was in fact informed.[14] The assessment is not invalidated by the IRS's failure to itemize in the summary record the quarters for which plaintiff was being assessed a penalty under § 6672.

### B. Amount of assessment

[6] The Government concedes that the amount of the outstanding assessment reflected on the Certificate of Assessments and Payments offered at trial is excessive. During trial, counsel for the Government

acknowledged that IRS workpapers reflected a $22,307.64 overstatement of H & T's trust fund liability for the second quarter of 1989, necessitating a reduction of that amount from the penalty assessed against plaintiff; and that five $150.00 checks from plaintiff had not been credited to him. Following trial, the Government was permitted to file an amended counterclaim "to conform to the evidence." Attached was an affidavit and a current Certificate of Assessments and Payments. The covering brief listed corrections which defendant stated could be calculated from the record. The brief reiterated the $22,307.64 and $750.00 corrections discussed at trial and also explained that H & T's transcripts of account reflect that the company satisfied its trust fund liability for the fourth quarter of 1988· and made partial payments toward its liability for the first quarter of 1989 for which plaintiff should be credited $98,850.60. Based on this submission, the Government reduced in its amended answer the judgment sought to $24,876.51 plus interest and additions. Plaintiff takes issue with the recomputation. In his opposition to the amended answer, plaintiff points out that the Government's recomputation credits him with an adjustment of $18,392.49, which is $5,000 less than the amount shown for the "same item" in the Certificate of Assessments and Payments introduced at trial.[15]

■ The court is unable to follow entirely the Government's explanation regarding the $98,850.60 reduction. It is also unable

---

**14.** The court notes that a separate line of decisions have held that the degree of specificity sought by plaintiff is, in any event, not required with respect to penalty assessments. *See Taylor v. United States (In re Taylor)*, 155 B.R. 543 (Bankr.N.D.Okla.1993) (mem.); *Ronsberg v. United States*, 798 F.Supp. 582 (D.N.D.1992); *Cutaiar v. United States*, 93–2 U.S. Tax Cas. ¶ 50,393 (CCH), 1992 WL 198927 (E.D.Pa.1992); *Hartnett v. United States*, 71 A.F.T.R.2d (P–H), 93–567, 93–1 U.S. Tax Cas. (CCH) ¶ 50,121, 1992 WL 276647 (D.Kan.1992); *McGinley v. United States*, 71 A.F.T.R.2d (P–H) 93–350, 1992 WL 437638 (W.D.Pa.1992).

**15.** Plaintiff argued in his opposition to the Government's motion to amend that the motion was an attempt to supplement the trial record after

trial. We disagree. A motion to amend the pleadings to conform to the evidence may be made "at any time, even after judgment." Rule 15(b). The Government consented at trial to reduce the judgment sought by sums of $22,307.64 and $750, and it alluded to the possibility that H & T had satisfied its payments for the fourth quarter of 1988. The court is satisfied that the recomputation is an attempt, based solely on the evidence presented at trial, to conform the pleadings to the evidence. Neither the motion submitted nor the exhibits accompanying it were offered as evidence, nor are they treated as such. Moreover, plaintiff failed to show how he is prejudiced by a reduction in the amount of the Government's counterclaim against him.

to trace the $5,000 credit that plaintiff says is missing from the Government's recomputation. Nevertheless, an assessment that is excessive in amount remains valid to the extent of the correct amount of the taxpayer's liability. *In re Burns,* 974 F.2d 1064, 1066 (9th Cir.1992); *United States v. Schroeder,* 900 F.2d 1144, 1148–49 (7th Cir. 1990); *Austin v. United States,* 461 F.2d 733, 737 (10th Cir.1972); *Psaty v. United States,* 442 F.2d 1154, 1163 (3rd Cir.1971); *see also United States v. Rindskopf,* 105 U.S. 418, 422, 26 L.Ed. 1131 (1882). Nor do the Government's reductions render the assessment invalid. *See Schroeder,* 900 F.2d at 1148–49 (stating that an assessment that is "too high does not make that assessment a *Janis* assessment, one without a rational foundation.").

In sum, the court is persuaded that plaintiff was properly assessed. While there is an obvious question as to the current quantum of the counterclaim, that is a matter which can be addressed separately from liability. The court is satisfied that the confusion as to quantum does not invalidate the assessment or prohibit the Government from attempting to establish its prima facie case as to plaintiff's liability for the penalty. Accordingly, we now focus our inquiry upon whether plaintiff was a responsible person at H & T and whether he was willful in failing to pay over the company's trust fund taxes.

## II. Responsible Person

In determining whether plaintiff is liable under § 6672, we first must determine his responsibility in failing to pay the tax. The United States Court of Appeals for the Federal Circuit has described this task as follows:

> The overwhelming weight of case precedent requires the factfinder to look through the mechanical functions of the various corporate officers to determine the persons having the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations. The inquiry required by the statute is a search for a

person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.

*Godfrey,* 748 F.2d at 1575 (citations omitted). The inquiry is not focused on the one person with the most authority over finances, but on all who have substantial authority. *Hochstein v. United States,* 900 F.2d 543, 547 (2nd Cir.1990); *Hammon,* 21 Cl.Ct. at 24; *Heimark v. United States,* 18 Cl.Ct. 15, 21 (1989); *see also Scott v. United States,* 173 Ct.Cl. 650, 657, 354 F.2d 292, 296 (1965). Therefore, it is no defense that others in the corporation have more authority than the individual charged. *See Gephart v. United States,* 818 F.2d 469, 476 (6th Cir.1987); *Scott,* 173 Ct.Cl. at 657, 354 F.2d at 296.

Courts may consider a variety of factors in determining whether an individual has ultimate authority, including the individual's status as an officer or director of the corporation; his duties as outlined in corporate resolutions and bylaws; and his authority to make corporate decisions, conduct the company's day-to-day operations, enter contracts, prepare corporate tax strategies, sway the corporate board, supervise employees, hire and fire employees, vote significant blocks of stock, control corporate finances, disburse payroll, sign checks or prevent their issuance by withholding a signature. *See Hochstein v. United States,* 900 F.2d 543, 547 (2nd Cir. 1990); *Godfrey,* 748 F.2d at 1575–76; *DiStasio v. United States,* 22 Cl.Ct. 36 (1990); *Heimark,* 18 Cl.Ct. at 24; *see also Thibodeau v. United States,* 828 F.2d 1499, 1503 (11th Cir.1987) (per curiam); *George v. United States,* 819 F.2d 1008 (11th Cir. 1987); *Hammon,* 21 Cl.Ct. at 24–26. The *Godfrey* court gave certain factors special weight:

> [W]here a person has authority to sign corporate checks, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of a corporation, he will generally be held "responsible."

*Godfrey,* 748 F.2d at 1576. Significantly, the *Godfrey* court cited these factors in the alternative. An individual need not have had authority to perform all three functions before "he will generally be held responsible;" any one of the factors mentioned may be enough. With these factors in mind, the court now turns to an examination of the record.

While an individual's status as an officer or director of a corporation is not determinative of responsibility, it is nevertheless material. *Godfrey,* 748 F.2d at 1575. A person's corporate title "often tells much about the individual's responsibility, authority, and power." *Williams v. United States,* 25 Cl.Ct. 682, 684 (1992). As both President and member of the Board of Directors, plaintiff enjoyed considerable status at H & T. At trial, plaintiff discounted his status, testifying that he was unsure why he was made President and that he was never treated as President. He stated that he did not do much office work, did not know anything about accounting and did not believe he had the authority to order payment to a creditor. Clearly, plaintiff's role as President was more limited than that of most who bear the title. However, the record reveals that his office was far from titular. In his capacity as President, Teets personally guaranteed loans to and promissory notes issued by H & T, opened and closed bank accounts, signed credit applications and authorizations of wire transfer privileges for certain employees, met with accountants and banking and insurance representatives and received correspondence from H & T's attorney. As compensation for his services, plaintiff was paid $124,800 per year in addition to benefits arising from his stock in the corporation. No one at H & T received a salary greater than plaintiff.

Plaintiff's duties as outlined in H & T's bylaws also indicate that he was a responsible person. Implicit in plaintiff's duties under the bylaws of the company was an obligation to participate in the allocation of corporate funds. As President, Teets was "generally and actively" responsible for managing the "business and affairs" at H & T. Although this responsibility was "subject to the directions of the Board of Directors," Teets was a member of the board. As such, it was his duty as provided in the bylaws to take part in managing every aspect of H & T's business and affairs. This duty included managing financial matters. Plaintiff cannot be excused from liability simply because Hughes, as Treasurer, was more responsible for corporate finances, or because in actuality, plaintiff was less involved in corporate finances than the other two owners. Teets' duty to participate, and his actual participation in, all aspects of corporate management, including administration of financial affairs and payroll tax payments, is clear.

In his testimony, Teets attempted to paint a picture of himself as someone who did not exercise presidential authority. The court is satisfied that this is in part accurate. He did not keep regular work hours at the office. Nor could he be viewed as the sole chief executive officer. In truth, he shared that role with Rusbridge and Hughes. However, the court is persuaded that Teets was by no means a figurehead. Teets helped make corporate decisions and assisted in conducting the day-to-day affairs of the business. Plaintiff attended the informal owners' meetings held weekday mornings and Saturdays, during which decisions about day-to-day operations and company finances were discussed and made. Plaintiff conceded that he sometimes gave input to assist in bid preparation and suggested strategies for handling corporate finances, such as reducing the owners' salaries and eliminating the use of company credit cards for personal expenses. Jim Reed, the office dispatcher, testified that although he did not sit in on the meetings, he saw all three owners meeting in the open room upstairs to talk about who needed to be paid and when. He stated that they would go into the conference room and shut the door when they were discussing financial problems. Plaintiff admitted that before the bankruptcy, he "might have" met with Hughes and Rusbridge to decide who the company was going to pay. Plaintiff's presence at the office each morning and most evenings "to

take care of any problems that had arisen during the day" further underscores his importance in handling the company's daily affairs.

The employees at H & T generally viewed Teets as a "laid back" person who did not make many demands of them and did not act or speak as a corporate president normally does. But there was no doubt that he performed many functions in his capacity as President. Joseph Cleary, one of H & T's superintendents, testified that when he wanted something done, i.e., needed approval for a large equipment lease or purchase of supplies to keep a job running, he usually went to Teets. Teets had supervisory authority over all personnel and operations at worksites to the south of the Palm Beach area, including Boca Raton and the large Arvida and Fisher Island accounts. In the office, although he had few typing needs, Teets had at his disposal Jody Meeks, the executives' secretary, to handle whatever he gave her. Teets had some independent hiring and firing authority, and all three owners were involved in hiring project superintendents. Plaintiff testified that he did not participate in hiring the office personnel, but Reed remembered that when he was hired, Rusbridge told him that he had to come by the office to talk with "the boys," meaning Teets and Hughes. All three of the owners were involved in the decision to let Reed go when finances became a problem in 1989. In the field, plaintiff had the authority to fire employees unilaterally.

Plaintiff did not control a majority of voting stock at H & T. However, with his one-third share, plaintiff controlled a significant portion—no one at H & T controlled more. Plaintiff argues that his one-third share was essentially meaningless because he could be overruled by the other two directors, especially with regard to financial matters. However, plaintiff's wishes were not always ignored by his co-owners. He admitted that at his insistence, the company stopped using Tri–County Concrete as a supplier for seven or eight months because plaintiff felt that someone at that company had been spreading rumors about H & T's poor financial condition. Rusbridge testified that all the stockholders were overruled from time to time. When asked if he remembered whether Rusbridge was ever outvoted in making corporate decisions, plaintiff conceded that he may have been. Indeed, if the possibility of being overruled on financial decisions prevented plaintiff from being a responsible person under § 6672, then no one at H & T would have been responsible because each owner only held one third of the company's stock.

Plaintiff had some control over corporate finances, but his control was not absolute. Large financial decisions were made by majority vote of the three owners. Plaintiff admits that he approved bills as legitimate, i.e, that the work had been performed and that the bill was ready to be paid, but there was evidence that his authority also went beyond that. Plaintiff conceded at one point in his testimony that he may have sat down with Budd and Hughes to figure out who to pay and how much. Parker stated that as President, Teets had the authority to order payments on the payroll taxes.[16] Plaintiff's response on his Form 4180 that all three officers

---

**16.** Budd testified that throughout the time she was there, when suppliers called and needed to be paid, she went to any one of the three owners who happened to be available to get permission to pay the bills so that the supplier would release its lien and H & T could collect its money. At different times, all three owners, including Teets, instructed her whether or not to pay bills on particular projects.

The court has reservations about Budd's testimony, however. Especially during cross-examination, she tended to be circumspect in answering certain questions. It was revealed that during her interview with IRS officer Mike Turaniczo in June 1992, she stated that she did not know who was responsible for maintaining the books and records at H & T, although it was quite apparent that she and Al Parker did the bookkeeping. Moreover, there was ample evidence that she was biased against Teets because of her ongoing employment relationship with the Hughes family, which began immediately after she stopped work at H & T, and because while she worked at H & T, Teets complained that she was paid too much and worked too little. Accordingly, the court assigns little weight to her testimony.

authorized payment of other obligations during the period when the tax liabilities were accruing provides further evidence that plaintiff had the authority to order checks to be cut. Plaintiff asserts that he was confused as to the thrust of the question and that his responses refer to his approval of checks as legitimate. The court is aware that plaintiff had difficulty understanding complex corporate matters and that the question posed was rather broad.[17] Nevertheless, when plaintiff answered the questions at the interview, he did so only after discussing the meaning of the question with Parker, who had an accounting degree and has mastered three languages. After discussing the meaning of the question, Parker supplied Teets with what he believed to be the correct answer, and Teets either agreed or disagreed before the answer was written. With such a system of safeguards against plaintiff's misunderstanding a question, it is difficult to imagine how he could have done so.

As a shareholder, plaintiff had complete access to all corporate books and accounts under the corporate bylaws. Plaintiff concedes that throughout the first and second quarters of 1989, he received copies of financial statements reflecting that H & T owed many creditors money, but he stated that he did not read them. His access to corporate financial information was consistent with that of one who had authority over such matters.

Despite Teets' protestations that he was too unsophisticated to understand financial matters, he exercised substantial control over payroll disbursements. As Mrs. Teets testified, her husband "always believed strongly that the help should be paid to keep the company operational." Tr. at 143. In fact, plaintiff was preoccupied with making sure the company met its payroll obligations. On those occasions when H & T was having difficulty meeting payroll, plaintiff would, either by his own decision or at the urging of Rusbridge and Hughes,

personally collect money to pay H & T's employees. At other times, plaintiff even made personal loans to H & T so that it could cover payroll. Thus, whatever distance plaintiff normally kept in financial matters, he apparently felt no hesitation about involving himself in disbursement of payroll or other matters that particularly interested him. It can only be surmised that he took such a personal interest in the disbursement of payroll because he felt that it was his responsibility to do so, which in fact it was.

Plaintiff's role as signatory also cannot be ignored. Although check-signing authority alone is not determinative of liability, *Godfrey*, 748 F.2d at 1575; *DiStasio*, 22 Cl.Ct. at 45, it "can weigh heavily in support of" a conclusion that a person is "responsible" within definition of § 6671(b). *Williams*, 25 Cl.Ct. at 684; *see also God-frey*, 748 F.2d at 1576. Plaintiff signed a substantial number (if not most) of the checks in the operating account. He signed payroll checks during each of the six months in issue. He signed some checks to cover the federal tax deposits for those periods prior to 1989 when H & T fulfilled its obligation to remit payroll taxes to the IRS. Plaintiff states that he signed a number of checks in blank because he knew that a second party might not be around. He also signed payroll withholding tax returns throughout the tenure of his presidency. He sometimes signed the check accompanying the return. In particular, plaintiff signed H & T's withholding tax return for the fourth quarter of 1988 and the first quarter of 1989. Teets denies that he had knowledge of or input into what he was signing—he simply signed whatever came across his desk. However, plaintiff's knowledge is relevant in determining whether plaintiff was willful, not in determining whether he was responsible. *Godfrey*, 748 F.2d at 1576.

---

17. Plaintiff contends that his responses on the Form 4180 should be ignored because the questions and format of the interview have been changed so as to more thoroughly and accurately inquire into the mechanism of corporate disbursements. However, the questions and format during plaintiff's interview were in accordance with then-existing IRS policy, and the answers elicited can be considered.

Moreover, plaintiff cannot escape liability by asserting that he could not cause a check to be issued because two signatures were required on each check. Teets had the power to withhold his signature, thereby impeding the issuance of checks to anyone other than the federal government. Nor is plaintiff relieved from liability by the fact that the signatures of Rusbridge and Hughes would have sufficed to issue a check, even if he did not sign. The circumstances presented here are similar to those in *Burack v. United States*, 198 Ct.Cl. 855, 869, 461 F.2d 1282, 1291 (1972). In *Burack*, a consolidation agreement between the principals of two businesses required the signature of one of two employees from each business before a check from the new company could be issued. Thus Burack, the taxpayer later assessed with a penalty for the company's nonpayment of trust fund taxes, shared his group's check-signing authority with Jaffe, another principal at Burack's former company.[18] Before the Court of Claims, Burack argued that the Raddings, principals of the other business involved in the consolidation and signatories on the new company's checking account, were responsible. However, the court rejected this argument:

> The fact that the Raddings may also have qualified as responsible officers does not acquit plaintiff. The Raddings may have given directions as to what checks should be drawn to pay which creditors, but those checks were worthless without plaintiff's cosignature. Authority to cosign in effect gives one the authority to decide which creditors should be paid. Plaintiff may not have participated in the preparation of the checks, but he had the power to prevent disbursement of funds except to appropriate creditors, and there can be no question that he had as much power and authority as the Raddings to direct to whom checks should be drawn.

*Burack*, 198 Ct.Cl. at 869, 461 F.2d at 1291; *see also Bolding v. United States*, 215 Ct.Cl. 148, 162, 565 F.2d 663, 671 (1977). *But see DiStasio*, 22 Cl.Ct. at 46. The

existence of an alternate means of issuing checks (as the Raddings had because of Jaffe's signatory power) does not relieve a signatory from responsibility if the signatory fails to withhold his signature. *See Gephart*, 818 F.2d at 476 (rejecting taxpayer's argument that others could have signed checks to creditors even if he refrained). Here, as in *Burack*, a contrary holding would effectively absolve all three principals from responsibility. In any event, plaintiff did cosign on H & T's checks, and in doing so exercised his authority to make payments to creditors.

Plaintiff argues that it was not part of his job to be involved with financial matters. He states that he did not actually have authority to order a check to be cut. He testified that it was not part of his job to determine who got checks. As discussed above, however, these protests are overshadowed by specific instances in which Teets did exercise his authority within the company. Plaintiff's self-serving conclusions that he was not responsible for financial matters in the company sufficient to release him from liability. *See Hanshaw v. United States*, 87–1 U.S. Tax Cas. ¶ 9248 (CCH), 1987 WL 11280 (S.D.W.Va. 1987).

Moreover, the court concludes that many instances in which he was not involved in a financial decision were because he chose not to exercise his authority, not because he actually did not have the authority. Plaintiff's assertion based on *In re Premo*, 116 B.R. 515 (Bankr.E.D.Mich.1990), that an individual who has but does not exercise authority cannot be held liable under § 6672 is misdirected. Plaintiff's circumstances are different from those in *Premo*. The *Premo* court concluded that "an individual who had the authority, but not the obligation, to direct tax payments to the IRS is not a responsible person if he did not exercise such authority." *Premo*, 116 B.R. at 529–30. Responsibility for tax payments in Premo's corporation were assigned to the Chief Financial Officer ("CFO") in accordance with procedures set up under the company's bylaws. *Id.* at 524. Moreover,

---

18. Burack actually cosigned on all the new company's checks.

Premo did not confer with the CFO nor decide with him which debts were to be paid so long as the CFO held the office. *Id.* at 530. No such arrangement existed here. Plaintiff had the obligation under H & T's bylaws to manage all of H & T's business and affairs. As previously discussed, this included management of H & T's trust fund payments. Additionally, the record shows that plaintiff was not so isolated from financial decisions as Premo. He not only had but also exercised sufficient authority to render him responsible to ensure tax payments.

*DiStasio* and *Williams*, also cited by plaintiff, present a somewhat closer question. In *DiStasio*, the taxpayer, a man of limited financial expertise, had the ability to sign checks, held the office of Vice–President, and held up to forty-nine percent of the corporate stock. However, DiStasio's check-signing authority was held to be "merely ministerial," his corporate title "meaningless" and his voting stock inconsequential due to the overwhelming dominance of the company's President, who exercised complete financial control of the corporation to the exclusion of DiStasio. *DiStasio*, 22 Cl.Ct. at 45–47. *Williams* also offers some parallels to the present case. The taxpayer in *Williams* had signatory authority, held the titles of Vice–President, Treasurer and Office Manager, was involved in the day-to-day operations of the business and prepared and signed tax returns. Despite this, however, Williams had no input into the financial decisions at the company. The submissive son of a domineering father who controlled the corporate fisc, Williams held no voting stock in the corporation, received a salary less than one third that of his father, and had no say in the disbursement of corporate funds. In fact, his signatory authority was solely at the direction of his father. As the court found, Williams "was obliged to do, and he did, whatever his father instructed." *Williams*, 25 Cl.Ct. at 684. Unlike DiStasio, plaintiff was involved in the day-to-day management of the corporation, had access to the corporate books and records, filed corporate tax forms, met with corporate accountants, and dealt with corporate attorneys relating to the legal affairs of the company. *Cf. DiStasio*, 22 Cl.Ct. at 45. Unlike Williams, plaintiff held and exercised the power to vote a block of stock as great as each of the other stockholders; his salary was equal to that of the other owners; and his signature, while often given without question, was not by permission only. While plaintiff had limited financial ability and was often overruled by his co-owners, he was not subject to the kind of exclusive decision-making power facing DiStasio and Williams.

We conclude that plaintiff was a responsible person under § 6672 during and after the first and second quarters of 1989.

### III. Willfulness

■ *Godfrey* defined willfulness under § 6672 as "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the government." *Godfrey*, 748 F.2d at 1577 (quoting *White v. United States*, 178 Ct.Cl. 765, 778–79, 372 F.2d 513, 521 (1967)). Most often, a responsible person is found to have been willful in failing to pay withholding taxes when he pays other creditors with knowledge that withholding taxes are due. *Hochstein*, 900 F.2d at 548; *White*, 178 Ct.Cl. at 778–79, 372 F.2d at 521; *Schultz v. United States*, 19 Cl.Ct. 280, 286, *aff'd*, 918 F.2d 164 (Fed.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1686, 114 L.Ed.2d 80 (1991). Knowing payment by a responsible person of net wages to himself and other employees when taxes are due also amounts to willfulness under § 6672. Actual knowledge that taxes are due is not necessary to trigger liability, however; "willful conduct may also include a reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Godfrey*, 748 F.2d at 1577. In *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987), the Seventh Circuit provided a test for determining whether a responsible person acted recklessly: "the 'responsible person' is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for

certain very easily." Nevertheless, the Supreme Court has warned that "[t]he fact that the provision imposes a 'penalty' and is violated only by a 'willful failure,' is itself strong evidence that it was not intended to impose liability without personal fault." *Slodov v. United States*, 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978). Therefore, "relevant evidence bearing on the element of personal fault cannot be ignored." *Godfrey*, 748 F.2d at 1577.

 A responsible person may negate the willfulness prong of the test under § 6672 by showing the absence of knowledge that taxes were not paid, the absence of a reasonable opportunity to discover and remedy the problem, *DiStasio*, 22 Cl.Ct. at 47–48, or that he "undertook all reasonable efforts to see that such taxes would in fact be paid, in circumstances where the employer had the means of payment and could reasonably be expected to make the payment." *Feist v. United States*, 221 Ct.Cl. 531, 542, 607 F.2d 954, 961 (1979). On the other hand, the Government may prove willfulness by showing that the responsible person exhibited a "reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government," manifested by a failure "to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." *Hammon*, 21 Cl.Ct. at 27 (quoting *Godfrey*, 748 F.2d at 1578).

 Plaintiff concedes that H & T paid creditors other than the IRS before, during and after the first and second quarters of 1989 on checks he cosigned. He also signed payroll checks to himself and other H & T employees in every month during the periods in issue. He has presented no evidence that H & T had insufficient funds to pay the taxes in full. He does not argue that he made any particular effort to see that the withholding taxes were paid. Instead, plaintiff asserts that he had no knowledge that withholding taxes were not paid and that he had no reasonable opportunity to remedy the problem.

At various points before, during and after the first two quarters of 1989, plaintiff learned (1) that H & T owed money to the IRS for delinquent taxes, (2) that the taxes due were payroll taxes, (3) how payroll taxes were withheld and paid over to the IRS, and (4) that they were taxes for which a penalty could be assessed against him personally. The question is when, if ever, did plaintiff become sufficiently knowledgeable about withholding taxes that he became willful under § 6672? Plaintiff testified that he did not even know what payroll taxes were until late in 1989, after the two quarters in issue. IRS agents were telephoning and making frequent visits to H & T, but plaintiff denies having dealt with anyone from the IRS until his meeting with Mike Turaniczo in the fall of 1989, even though he admits that he received phone calls from other irate creditors. He also admitted that he was aware that there were problems with the IRS beginning in January 1989 when the IRS levied on H & T's account at Suburban Bank for failure to pay withholding taxes for the first quarter of 1988, but that he did not know at that time exactly what kind of taxes were owed. This is simply not plausible. The Government contends, and we agree, that as of January 1989, plaintiff knew that H & T was not fulfilling its payroll tax obligations.

Plaintiff signed checks to the IRS for withholding taxes as early as February 1987. Moreover, Albert Parker testified that when he first became involved with payroll taxes two or three months after coming to work for H & T in March 1988, Teets knew what payroll taxes were and that they were overdue. Harold Rusbridge testified that the fact that payroll taxes were going unpaid in the fourth quarter of 1988 and the first two quarters of 1989 was something that all three owners would have been aware of, although he did not recall any specific discussions to that effect. Teets sat in on meetings where financial troubles were discussed and received lists of creditors. He had to collect money from suppliers or make personal loans just so that the company could cover payroll to its employees. It is inconceivable that someone with plaintiff's interest in

payables and receivables and exposure to financial discussions, corporate records, IRS forms and tax problems did not know the nature of H & T's tax liability. In light of the testimonies of Teets and the other H & T employees as well as the documents that Teets saw and signed, the court finds ample evidence from which to conclude that Teets knew in January 1989 that payroll taxes were owed to the IRS.

Even if the court were to accept plaintiff's testimony that he did not know in January 1989 what kind of tax H & T owed, his ignorance does not relieve him from liability. Certainly, if he did not know, he should have known. When Teets discovered that taxes were due, it was his duty as a responsible person under § 6672 to find out what kind. If he did not understand what kind of taxes were due, he could have asked Al Parker, his attorney, H & T's accountant, or even the other two owners. But he did not ask. Instead, we must infer, he deliberately chose to remain ignorant. A person responsible for the financial interests of the company cannot avoid liability for failure to ensure payment of withholding taxes by stating that he did not know all the details surrounding the delinquency. *See Sorenson v. United States*, 521 F.2d 325, 329 (9th Cir.1975) (holding that a mistaken belief that withholding is unnecessary does not absolve responsible person from liability: "If [Sorenson] did not understand his responsibilities it is because he did not ask those who could have informed him; and if he did not ask we are inclined to believe that was because he preferred ignorance."). As the Seventh Circuit stated, responsible persons cannot avoid liability "just by compartmentalizing responsibilities within a business ... and adopting a 'hear no evil—see no evil' policy." *Wright*, 809 F.2d at 427.

Nor is plaintiff excused by the fact that the tax problem he learned of came from a quarter previous to those in issue. Al-

though knowledge of a prior withholding tax delinquency does not render a responsible person strictly liable for all further delinquencies, *Godfrey*, 748 F.2d at 1568, "if a responsible officer knows that the corporation has recently committed such a delinquency and knows that since then its affairs have continued to deteriorate,. he runs the risk of being held liable if he fails to take any steps either to ascertain, before signing checks, what the state of the tax withholding account is, or to institute effective financial controls to guard against nonpayment." *Wright*, 809 F.2d at 428.

When Teets first discovered that H & T was having financial difficulty, he approached the owners "once or twice a year." At those times, according to plaintiff, "[t]hey would kind of chuckle, [and say] [']don't worry [about] it, there's plenty of money and everything to cover everybody if we have to close the doors tomorrow morning.['] And I lived with that— with their judgment on that because they handled the financial end of the corporation." Tr. at 599. However, in January 1989, when plaintiff says he discovered that the company owed money to the IRS, he received assurances not that the IRS would be paid, but that the owners would not be economically affected. As plaintiff related: "We talked about it and, like I said before, the equity and the equipment and all our other assets, even if we closed the door tomorrow, with our receivables we'd still walk out of here with three, four hundred thousand dollars apiece." Tr. at 612–13. The record shows that plaintiff did nothing further in the early part of 1989 to see that H & T's withholding taxes were paid.[19] Instead, plaintiff adopted a business-as-usual attitude about the state of H & T's finances. The following excerpt from the trial is especially revealing:

Q. Do you remember anybody telling you the IRS would be paid from there [the January 1989 levy] forward?....

---

19. In fact, when Hughes and Rusbridge approached plaintiff in May 1989 about loaning the company money to pay off some of the tax debt, he refused. Plaintiff suggested that instead of loaning the company money, the owners simply ought to forgo their salaries. How-

ever, when the other two discarded plaintiff's idea in favor of loaning the money, plaintiff continued to draw his annual salary. Rusbridge and Hughes loaned $165,000 to H & T to stave off another IRS levy, but plaintiff did nothing to assist the company in paying the IRS.

You had a discussion about the levy with your other two partners; is that correct?

A. The levy on our accounts?

Q. Yes.

A. On the one time, yes.

Q. And were you ever told after that date that the taxes were being taken care of?

A. I didn't get into that. You know, I didn't get into the financing of who had to be paid or what had to be paid.

Q. Well, you were concerned, weren't you, that the creditors had to be paid?

A. I was what?

Q. Concerned.

A. I was concerned always from the day one of H & T Contractors that we were constantly in debt, and I was always assured that don't worry about anything, and that's the way I left it.

Q. Did you ask anybody after the levy in January 1989 whether anybody at the IRS was being paid?

A. I don't believe so. I don't believe that I asked Mr. Hughes or Mr. Rusbridge....

....

At that point I still didn't understand the withholding tax of the checks for the employees. It was just another tax to me. It wasn't anything that was, you know, 200,000, 300,000.

I mean, when you're dealing in the numbers that H & T Contractors had and the debt we had, that was a small debt. I mean, 200,000, we owed suppliers 300,000 at times.

And so, I mean, there wasn't—it wasn't anything that you're supposed to go home and cry about because we owed 700,000 or 900,000 to creditors and stuff because they would be paid when the draws come in.

So the IRS was a creditor, I guess. I mean, that's, you know, they were just another debt that we had.

Tr. at 719–21. In accordance with this attitude, Teets continued to cosign checks on the company's bank accounts to pay creditors other than the IRS. He also signed withholding tax returns on January 31 and April 28, 1989, indicating that the company had not paid over $400,000.00 in withholdings. Line 18 of both returns reads "Balance due.... This should be less than $500. Pay to IRS." Although the signature line includes a declaration that he had examined the return, plaintiff asserted that he had no idea what the form was, what it referred to, or that the money was not actually being sent to the IRS.

Plaintiff cannot assert that he relied on the assurances of Hughes and Rusbridge that H & T's financial obligations were taken care of or that he simply signed whatever was placed on his desk, often in blank, as a merely ministerial function. In light of his knowledge of the casual handling of finances by Rusbridge and Hughes, the constant complaints from unpaid creditors and the levy against H & T in January 1989 resulting from gross neglect of company tax obligations, plaintiff could not conceivably have relied on Hughes and Rusbridge to maintain the company's payments. The court is persuaded after listening to plaintiff and considering the balance of the record, that although plaintiff may not be sophisticated as to financial matters, he is by no means unintelligent. He has natural business instincts. His lack of greater involvement in company affairs was due to his lack of interest in paperwork, not to a lack of ability to comprehend the company's affairs. Nor can plaintiff argue that his attitude following the January levy resulted from a realization that there was no reasonable opportunity to remedy the problem. Even if true, these excuses do not absolve plaintiff from liability under § 6672. Instead, such rationalizations "simply amount to injecting considerations of alleged 'reasonable cause' or 'justifiable excuse' elements into the definition of willfulness of a type which this court, in *McCarty*, rejected." *Burack v. United States*, 198 Ct.Cl. at 870–71, 461 F.2d at 1292 (citing *McCarty v. United States*, 194 Ct.Cl. 42, 53–54, 437 F.2d 961, 967 (1971)); *see also Pacific Nat'l Ins. Co. v. United States*, 422 F.2d 26, 33 n. 19 (9th Cir.), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 *reh'g denied*,

400 U.S. 883, 91 S.Ct. 116, 27 L.Ed.2d 121 (1970).

At the very least, plaintiff should have ascertained the status of the tax delinquency before signing any further checks, and withheld his signature until the IRS was paid. If he did not feel that he could unilaterally order a check to be cut, he at least could have asked when and if such a check would be cut. Barring all else, he could have resigned. In other words, he "clearly ought to have known that there was a grave risk that withholding taxes were not being paid" and he "was in a position to find out for certain very easily," but he failed to act. *Wright*, 809 F.2d at 427. The court further concludes that if nothing else, plaintiff's affirmative act of signing checks with such a clear opportunity to know that the IRS might not be paid makes the company's failure to pay plaintiff's own personal fault.

Plaintiff's opportunities to become aware of H & T's failure to pay its withholding taxes continued throughout 1989. However, plaintiff states that only as of the latter part of 1989 did he begin to take a more active role as to the company's finances, but did so then only out of necessity, because the other two owners "left him holding the bag." Then, it was conceded at oral argument, he became responsible for and aware of the extent of the withholding taxes problem,[20] after the time for remitting withholdings for the first two quarters of 1989 had passed. However, payment of creditors other than the IRS either during the quarter in issue or after the due date is considered willful behavior. *Thibodeau v. United States*, 828 F.2d 1499, 1505 (11th Cir.1987); *Newsome v. United States*, 431 F.2d 742, 745 (5th Cir.1970).

Plaintiff argues that his failure to apply funds acquired subsequent to gaining knowledge of the delinquency does not render him liable under § 6672 because of a narrow exception carved out by the Supreme Court in *Slodov:*

We hold that a "responsible person" under § 6672 may violate the "pay over" requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501, but that § 7501 does not impress a trust on after-acquired funds, and that the responsible person consequently does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

*Slodov*, 436 U.S. at 259–60, 98 S.Ct. at 1791. Thus, a taxpayer wishing to use *Slodov* as a defense must show that he acceded to control when there were insufficient funds with which to satisfy the tax obligation and after-acquired funds were not directly traceable to the taxes collected.

■■■■■ Even if we were to accept plaintiff's assertions that he became sufficiently aware of and involved in the payment of withholding taxes only after the quarters in issue, which we do not, *Slodov* does not provide plaintiff with a defense. To begin with, Teets does not satisfy the first prong of the *Slodov* test. *Slodov* did not equate transfer of responsibility within the corporation with the accession of new management. *Davis*, 961 F.2d at 873–74; *see also Garsky v. United States*, 600 F.2d 86, 91 (7th Cir.1979); *Kizzier v. United States*, 598 F.2d 1128, 1134 (8th Cir.1979); *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir.), *cert. denied sub nom., Lattimore v. United States*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). If anything, plaintiff, as President of the corporation before, during and after the period in issue, merely took part in an internal shuffling of responsibilities. He did not accede to power as new management within the contemplation

---

**20.** However, plaintiff stated that he made additional discoveries about the mechanics and importance of withholding taxes after the bankruptcy and even during his deposition prior to trial.

of the *Slodov* test. Furthermore, other than stating that the company filed for bankruptcy on December 31, 1989, six months after the end of the second quarter, plaintiff did not present any evidence that the company had insufficient funds to pay the IRS. The company continued to pay creditors other than the IRS on checks cosigned by plaintiff through December 1989.[21] As with the other aspects of willfulness, plaintiff bears the burden of proving that insufficient funds existed to pay the IRS. *See Thibodeau*, 828 F.2d at 1505; *Mazo*, 591 F.2d at 1155. Plaintiff did not meet that burden. Consequently, plaintiff is unable to invoke the *Slodov* defense.

In *Davis v. United States*, 961 F.2d 867 (9th Cir.1992), the Ninth Circuit faced circumstances very similar to those before this court. There, the plaintiff was President of a corporation which failed to pay its withholding taxes during the last quarter of 1981 and the first two quarters of 1982. Pursuant to § 6672, the IRS assessed a penalty against Davis. He contested both his status as a responsible person and that he had acted willfully. He claimed that he did not learn of the tax delinquency until July 1982, at which time the payments for all quarters in issue were past due. He argued that under *Slodov*, he did not act willfully because he had no obligation to apply after-acquired funds exclusively to satisfy the company's tax delinquency. He contended that his assumption of a more active role in the supervision of corporate disbursements only after learning of the delinquency was an accession to power of the type which *Slodov* sought to protect. The Ninth Circuit disagreed. It interpreted *Slodov* as applying only to cases involving the accession of new management. *Davis*, 961 F.2d at 873; *Slodov*, 436 U.S. at 245–46, 98 S.Ct. at 1784–85. The Ninth Circuit noted that Slodov had no role in the corporation at the time the taxes should have been remitted, nor did Slodov's corporation have any funds to pay the tax when he arrived. *Davis*, 961 F.2d at 873. In contrast, the court stated that Davis

> did not simply appear on the eve of tax payment day. To the contrary, his status and role in the corporation made him a responsible person from the day the first salary was paid in the last quarter of 1981. Moreover, Davis has made no showing that corporate funds did not exist with which to satisfy the tax liability on the payment due date. He contends only that the funds actually withheld had been disbursed by this time.

*Id.* Like Davis, plaintiff has failed to satisfy either prong of the *Slodov* defense. Accordingly, even if plaintiff correctly contended that only in the latter part of 1989 did he become sufficiently knowledgeable about payroll taxes to activate § 6672, his failure to apply all funds acquired after that point to the company's trust fund tax liability still renders him willful.

## CONCLUSION

For the foregoing reasons, the court concludes that during the first and second quarters of 1989 plaintiff was a responsible person and that he acted willfully in failing to ensure that H & T paid over its withholdings taxes during those quarters. He is therefore liable under § 6672 for one hundred percent of the unremitted funds. The parties are directed to attempt to reach agreement as to the correct amount of the assessment and file a status report on or before August 31, 1993.

## *ORDER ON RECONSIDERATION*

In its order as to liability of August 5, 1993 (reissued for publication September 2, 1993), the court concluded that during the first and second quarters of 1989 plaintiff was a responsible person and that he acted willfully in failing to ensure that H & T paid over its withholding taxes during those quarters. He is therefore liable under § 6672 for one hundred percent of the

---

**21.** By stipulation of the parties, the court admitted Defendant's Exhibit 42–U, which contains the checks signed to creditors other than the IRS during 1989, for the limited purpose of the dates shown on them, the fact that Teets or someone else from H & T signed the check, and the payee. The amount of the checks, from which the presence or absence of sufficient funds may be derived, is not in evidence.

unremitted funds. The parties were directed to attempt to reach agreement as to the correct amount of the assessment. Based on the status report of August 31, 1993, the court ruled on September 2, 1993 that plaintiff owed defendant the sum of $19,-867.41 plus interest, and judgment was entered accordingly. Plaintiff has now timely filed a motion for reconsideration, for a new trial and for amendment of the judgment. For the reasons that follow, the motion is denied in part and granted in part.

Four grounds are asserted for the motion. The first two, that the United States failed to produce certain documents in its possession and that it failed to produce a competent witness are not a basis for reconsideration. Those issues are merged fully into the earlier ruling and nothing new is asserted in the pending motion.**

The third ground for reconsideration is that a factual error exists in the court's recitation at page four of the opinion of August 5 that "In January 1989, the IRS levied on H & T's $35,241.54 account with Suburban Bank in partial satisfaction of the company's payroll tax liability for the first quarter of 1988." Plaintiff argues that the levy was not for the entire amount in the bank account of the corporation and was not for a partial amount due at the time of the levy. Instead, the levy satisfied the payroll tax liability for the first quarter of 1988. The amount owed to the IRS at the time was $35,241.54. Defendant concedes that the liability for that quarter was satisfied by the levy and does not contest the amount owed at the time. Defendant is correct that whether the account was consumed by the levy is not clear from the record. There is some evidence that it was. For good reason shown, the sentence in question is withdrawn from the opinion and the following substituted: [Editor's

Note: Change incorporated for publication purposes.] While the court appreciates plaintiff's argument that the relative amounts of the earlier levy and the subsequent liabilities are relevant to the state of his mind at the time, the court sees no reason to change the analysis and ultimate findings on page 711 of the opinion, where the plaintiff's knowledge is discussed.

The final element of the motion for reconsideration is somewhat confusing. Plaintiff wishes a judgment in his favor reflecting that he is not liable for payroll taxes with respect to the last quarter of 1988 or the last two quarters of 1989. In view of the satisfaction of 1988 assessments, it was not necessary to determine whether plaintiff was a responsible person for the last quarter of that year. Penalties assessed for the last two quarters of 1989 were abated. The court specifically rejected the argument that plaintiff met an exception to liability with respect to after-acquired assets. Plaintiff ultimately was found liable with respect to all outstanding corporate withholding taxes. The $150-per-quarter payments were applied to the outstanding liability, there was thus no occasion to order their return. The questions raised by the complaint and counterclaim were whether plaintiff was entitled to a refund of taxes or whether defendant was entitled to additional payments. Those questions were answered. Accordingly, there is no occasion for the court to address, in the abstract, plaintiff's knowledge with respect to quarters not in issue. Such a ruling would amount to a declaratory judgment.

To the extent that the plaintiff contends he was the prevailing party, the court disagrees. Although the judgment for defendant was substantially less than the amount originally sought by the counterclaim, the reduction was almost completely due to payments made by the plaintiff or the corporation.

The motion for reconsideration is granted in part. The Order of August 5, 1993 is

---

** Except the assertion that counsel for the Government was unaware of the consequences of a ruling against plaintiff. That is irrelevant.

corrected as indicated herein. The motion is otherwise denied.